STATE of Tennessee, Appellant,

v.

Hobart Millard LUNSFORD, Appellee.

Court of Criminal Appeals of Tennessee,
at Knoxville.

April 24, 1980.

Permission to Appeal Denied by Supreme
Court July 28, 1980.

William M. Leech Jr., Atty. Gen., Robert L. Jolley, Jr., Senior Asst. Atty. Gen., Nashville, J. William Pope, Jr., Dist. Atty. Gen., Pikeville, and Ray Taylor, Asst. Dist. Atty. Gen., Dayton, for appellant.

James W. McKenzie, Dayton, for appellee.

## OPINION

SCOTT, Judge.

In this interlocutory appeal, pursuant to Rule 9, T.R.App.P., the state has appealed the holding by the trial judge that two statements were not dying declarations and are not admissible in evidence. We agree as to one and disagree as to the other.

The judge filed an excellent memorandum setting forth the facts, the law, and his holding. Our recitation of the facts, for the most part, is drawn from his memorandum.

Shirley Queen was shot at the AmVets Club in Decatur, Tennessee, on July 14, 1978, at about 3:30 A. M. She was later taken to the Athens Community Hospital arriving there at about 4:45 A. M. Shortly after she reached the hospital she was interviewed by Terry Bowers and Rick Cornett, deputies to the McMinn County Sheriff. According to Mr. Bowers' description, when he saw her in the emergency room her neck was swollen from a gunshot wound which he described as "very serious." She had blood all over her, "plumb down to her feet". From her facial expressions she appeared to be in great pain. She kept complaining, according to Mr. Bowers, that she was going to die. According to his testimony she stated, "Don't let me die, I know I'm dying any way." She was rational and explained how she was shot and that the man who shot her was the same one who brought her to the hospital. She did not know his name.

Mr. Cornett corroborated Mr. Bowers' statements concerning her pain which he determined from her actions, words, and appearance. She was, according to Mr. Cornett, "in fear of losing her life." She said something like, "Don't let me die".

Ms. Queen was transferred to the intensive care unit of Erlanger Hospital in Chattanooga, where Raymond D. Taylor, an Assistant District Attorney General interviewed her on July 20, 1978. Since she was outfitted with various tubes in her mouth and nose, she was unable to speak. Mr. Taylor asked her questions to which she nodded affirmative or negative responses. According to his testimony and his notes, he told her that, "she could very possibly die from the wound that she received." When asked if she knew that, she nodded in the affirmative and started crying. He then proceeded to ask her twenty–eight questions concerning the shooting.

Ms. Queen remained in intensive care at Erlanger where she died on August 22, 1978.

There is no question that the victim made the statements; that the statements are material evidence concerning the immediate circumstances of the killing; nor that the victim died as a result of the wounds, or from complications brought about by the wounds.

The entire controversy revolves around whether the declarant had "a certain belief that rapid death is inevitable." This, the learned text writer teaches us, is the most essential element of the dying declaration exception to the hearsay rule. The requirement is one of hopelessness, and it must be met. Where the person is oblivious to the danger, or where he is merely aware of a possibility or even a probability, the requirement of hopelessness is not met. The fact that the declarant regains hope between the time of the declaration and her

ultimate death is no cause for exclusion. Paine, *Tennessee Law of Evidence,* § 63, citing *Brakefield v. State,* 33 Tenn. (Sneed) 214, 218 (1853).

When the party is at the point of death, and every hope of this world is gone, when every motive of falsehood is silenced, and the mind is induced by the most powerful consideration to speak the truth, a situation, so solemn and so awful, is considered as vesting an obligation equal to an oath. *Smith v. State,* 28 Tenn. (9 Humph.) 9, 19 (1848).

As our Supreme Court has stated:

(I)t must appear that the deceased, (technically the declarant), at the time of making such declarations, was conscious of his danger, such consciousness being equivalent to the sanction of an oath; and that no man could be disposed, under such circumstances, to belie his conscience, none at least who had any sense of religion. But such consciousness need not have been expressed by the deceased. It is enough if it might be collected from circumstances; . . . *Anthony v. State,* 19 Tenn. 265, 278 (1838), cited in *Beard v. State,* 485 S.W.2d 882, 885 (Tenn.Cr.App. 1972).

■ Among the circumstances from which the inference of consciousness of impending death can be drawn are the dangerous nature and character of the wound, the state and illness of the declarant, her sinking condition, statements of extreme suffering, and the presence of symptoms which usually precede death. *Anthony v. State,* Id.

In *Dickason v. State,* 139 Tenn. 601, 202 S.W. 922, 923 (1918), the Supreme Court held that the sense of impending death may be shown by the language of the deceased, or inferred from the character of the wound, or set up by the testimony of physicians or other attendants. As tending to establish the consciousness of "impending dissolution" the cases have attached much importance to the character of the wound. . . . This . . . does not mean that the inference may be drawn from the mere fact that the wound, in the

opinion of the man of science, was in point of fact mortal; but that the nature of the wound or the state of illness should be such as to affect the knowledge, and control the opinion of the dying person himself, as to the danger to which he stands exposed.

Some wounds are of such a nature that they could not leave any rational being in doubt as to her great danger of immediate death. *Anthony v. State,* supra at 278, 280.

■ As to the first statement in the emergency room the trial judge found that:

The proof fails to prove even by a preponderance of the evidence that Ms. Queen made the first statement in the presence of Officers Bowers and Cronett under a sense of impending death. "Don't let me die" stated by both officers indicates hope of recovery on the part of the declarant. *"I know I'm going to die"* standing alone and satisfactorily established as the words of the declarant would indicate hopelessness, but this was not so established.

We disagree. The statement, "Don't let me die" does not necessarily indicate a hope of recovery. No rational person wants to die and a dying man will beg for assistance from those in attendance at his passing. The judge found that the words, "I know I'm going to die" standing alone would indicate hopelessness, but he found that the statement was not satisfactorily established. Again, we disagree. The officers were called to the hospital to interview a woman who had received grievous wounds. They did not have tape recorders, stenographers, or even note pads. They were relying entirely upon their memories of the words spoken. We believe that, under the circumstances, the spoken words themselves indicated a belief by Ms. Queen that she was dying. In addition, the circumstances would lead one to the conclusion that she believed she was dying. A gunshot wound to the neck from which massive amounts of blood had escaped was of a dangerous nature and character. She was experiencing extensive suffering and apparently sinking

from the loss of blood. These are symptoms which usually precede death.

She had been shot in the neck and knew it. She was covered with blood and could see it. She was conscious and aware of her pain. This statement qualified as a dying declaration.

As to the second statement at Erlanger Hospital, the judge found that:

The question posed to Ms. Queen and designed to indicate her awareness of impending death related only to a *possibility*. Her response was an affirmative nod and to cry. . . . The proof fails to demonstrate even by a preponderance of the evidence that this communication is admissible as a dying declaration.

We agree.

By the time this interview took place, Ms. Queen's condition was somewhat stabilized. She was in the intensive care unit of a large, modern, well-equipped, urban hospital, and was receiving expert care. At that time there was little to indicate to her or her attendants that her condition was hopeless. From the rather crass statements, "that she could very possibly die from the wound," and the victim's concurrence therein, one simply does not perceive a degree of hopelessness.

Therefore, the findings of the trial judge are reversed as to the emergency room statement and affirmed as to the Erlanger Hospital statement. The cause is remanded for trial.

BYERS and CORNELIUS, JJ., concur.