IN THE TENNESSEE COURT OF CRIMINAL APPEALS

AT NASHVILLE

JUNE 1994 SESSION

**FILED**

**July 31, 1997**

**Cecil W. Crowson
Appellate Court Clerk**

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Appellee, | ) | No. 01C01-9401-CR-00029 |
| | ) | |
| v. | ) | Davidson County |
| | ) | |
| MARUJA PAQUITA COLEMAN, | ) | Honorable Ann Lacy Johns, Judge |
| | ) | |
| Appellant. | ) | (Second Degree Murder) |
| | ) | |

For the Appellant:

Karl Dean
District Public Defender
   and
John D. Wiethe
Cynthia Burns
Assistant Public Defenders
1202 Stahlman Building
Nashville, TN 37201

For the Appellee:

Charles W. Burson
Attorney General of Tennessee
   and
Eugene Honea
Assistant Attorney General
450 James Robertson Parkway
Nashville, TN 37243-0493

Victor S. Johnson, III
District Attorney General
   and
Roger Moore
Don Himmelburg
Assistant District Attorneys General
Washington Square
222 2nd Avenue North
Nashville, TN 37201-1649

OPINION FILED: _____

AFFIRMED

PER CURIAM

**O P I N I O N**

The defendant, Maruja Paquita Coleman, appeals as of right from her judgment of conviction in the Criminal Court of Davidson County for second degree murder, a Class A felony. She was sentenced to twenty-five years in the custody of the Department of Correction as a Range I, standard offender to be served consecutively to a sentence for which she had been on parole. In this appeal as of right, the defendant presents the following issues:

> (1) Is the evidence sufficient to support her conviction for second degree murder?

> (2) Did the trial court properly admit into evidence statements of the deceased under the dying declaration exception to the hearsay rule?

> (3) Did the trial court err in imposing the maximum sentence?

We hold that the evidence presented at trial is sufficient to sustain the defendant's conviction for second degree murder and that no error exists.

The facts surrounding this offense involve an incident in the early morning hours of September 2, 1992, in which Sheila Annette Holman received second and third degree burns that covered her upper torso. Her injuries eventually proved fatal and she died ten days later. At first, both Ms. Holman and the defendant said that the fire started as they tried to pour gasoline into Ms. Holman's car. Later, both acknowledged that they had quarreled and that, during a struggle, Ms. Holman was doused with gasoline. The defendant was arrested for aggravated assault, but after Ms. Holman's death, she was indicted for second degree murder.

Testimony at trial revealed that on the morning of September 2, 1992, Ed Jones, the victim's grandfather, awakened at about four o'clock. He thought he heard a dog barking and went to look out into his yard. When he saw fires burning in his granddaughter's front yard, he shouted to his wife, Pearl, to call the fire department. As

2

Mrs. Jones telephoned, Mr. Jones watched the victim and the defendant walk through the shrubbery that separated the two properties and come to where he was waiting on the back porch.  When he saw that his granddaughter's clothing was "all just strings" and "she was sooted and dirty and raggedity," he asked her what had happened to her. She told him that they had been putting gasoline in the carburetor and it had exploded.

By the time Mrs. Jones stepped onto the porch, the victim was sitting there and the defendant was standing next to her.  She saw that her granddaughter had been badly burned and that her clothing was "just melted to her skin."  When her granddaughter said, "Momma, Momma, I'm burning, I'm burning," Mrs. Jones went back inside and called 911.[1]  Within moments the fire department, the paramedics and the police arrived.  As the rescue squad carried the vicitm to the waiting ambulance, the defendant asked her if she wanted the defendant to come to the hospital.  The victim did not answer, but called "Come on.  Momma, come on."  Before leaving in the ambulance, Mrs. Jones heard the defendant say that she wanted to go to the V.A. Hospital because she had been burned as well.

At the emergency room, Detective David Miller spoke with the victim.  He described her as in pain but lucid.  He advised her that she was in "very serious condition."  She told him that she and the defendant had been in a fight, a domestic argument, and that when the defendant had thrown gasoline on her, she was engulfed in flames.  The victim said that the defendant was smoking a cigarette at the time, but she did not know whether the defendant had flicked a lighter or thrown the cigarette. The detective asked her if "this was intentional," and she said yes.  When he asked her if she wanted to prosecute the defendant, she said yes.

---

[1] Sheila Holman grew up in her grandparents' home and she considered them to be her parents.

Police at the scene quickly determined that the fire could not have started the way the victim and the defendant had first described it. The hood on the automobile was closed, and there was no sign of any fire damage under the hood or anywhere on or near the automobile. The gasoline can was sitting in the middle of the front yard. A patch of grass near the can was burned. Five smaller burnt patches were scattered about the yard, but none were near the driveway where the car was parked. Both the front and the back doors to the house were open, and the victim's two sons were asleep inside their bedroom. In the living room, the police found empty liquor and beer bottles and glasses half-filled with a clear liquor. An empty, quart beer bottle was found sitting upright near the driveway.

When questioned, the defendant at first held to her earlier story, but she became increasingly nervous and soon admitted that she and the victim had fabricated the earlier version. In her written statement and in her testimony at trial, the defendant stated that she and the victim had become acquainted at work and were lovers. After a long bout of drinking and smoking crack cocaine, the two had argued. The defendant wanted to break off their affair, and the victim became furious. According to the defendant, the victim had chased her out of the back door and flung black pepper in her face. When the defendant ran around to the front of the house, she found the victim taking the top off the gas can that was on the front porch. The two struggled, and when the victim grabbed the can away, gasoline slopped on her. As the defendant turned to walk toward the car, she lit a cigarette. The victim followed her and asked her for a light. When she turned around and extended her hand toward the victim, the victim's long thin blouse burst into flames. The victim ran screaming around the yard and the defendant chased her. When the defendant caught the victim, she knocked the victim to the ground and helped smother the flames with her hands and body. The two women then concocted the story they first told and walked, hand in hand, to the

4

grandparents' nearby home. Throughout, the defendant maintained that they accidentally spilled and ignited the gasoline.

Mrs. Jones testified that during the ten days before the victim died, she had visited her frequently. On three separate occasions, Mrs. Jones asked the victim whether "that woman (meaning the defendant) had done this to her." Mrs. Jones testified that, each time, her granddaughter had nodded her head as if to say yes.

Dr. Charles Harlan, the state's medical examiner, presented the only medical testimony at trial. He found many second and third degree burns on the victim's body. There were also burns on the front of the right leg and on the posterior aspect of the legs. The most serious burns were found on the back and front of the torso and to the arms. Dr. Harlan stated that the victim had died of pneumonia resulting from pulmonary edema and that, within a reasonable degree of medical certainty, the burns caused Sheila Holman's death.

The defendant testified in similar fashion to the last statement that she gave police relative to the incident being accidental. She proved that she had second degree burns to the four fingers on her left hand, and to portions of her left arm.

I

When the sufficiency of the evidence is questioned on appeal, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we may not reweigh the evidence, but must presume that the jury has resolved all conflicts in the testimony and drawn all

5

reasonable inferences from the evidence in favor of the state.  See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

The evidence presented at trial is sufficient to support a conviction for second degree murder beyond a reasonable doubt.  Tennessee law defines second degree murder as the unlawful "knowing killing of another."  T.C.A. §§ 39-13-201 and -210(1).  "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result."  T.C.A. § 39-11-302(b).  The jury heard evidence from which a rational trier of fact could find beyond a reasonable doubt that after a long argument in which the victim chased the defendant out of the house and threw pepper in her eyes, the defendant set fire to the victim knowing that the victim's death was reasonably certain to result.

## II

The defendant complains about the admission into evidence of the victim's statements to Detective Miller and her grandmother at the hospital.  She contends that the statements are inadmissible hearsay, not qualifying as dying declarations because the evidence is insufficient to establish that the victim was conscious of her impending death at the time she made the statements.  The state responds that her consciousness of impending death may be inferred from the character of the wounds and that, in this instance, the five photographs depicting the nature of the wounds show that the requirements of a dying declaration are satisfied.

As a starting point, we will discuss the burden of proof in the trial court and the standard of appellate review of the trial court's findings and conclusions.  The trial court conducted a jury-out hearing at the beginning of the trial in order to determine

6

the admissibility of the statements.  After the hearing, the trial court found that based on the seriousness of the victim's condition and the fact that the victim was lucid and able to assess her condition, that the requirements for a dying declaration had been met.

At trial, the burden was on the state as the proponent of hearsay statements to justify their admission as exceptions to the hearsay rule of exclusion, in this case as dying declarations.  To carry that burden, the state was obligated to prove to the trial court by a preponderance of the evidence the existence of the preliminary facts needed to show that the statements were dying declarations.  See State v. Stamper, 863 S.W.2d 404, 405-06 (Tenn. 1993) (preponderance of the evidence standard applies to hearsay exception preliminary facts).  Essentially, this means that the trial court must find that it is more probable than not that the preliminary facts exist.  Once the trial court makes such a finding, the evidence is admissible.

For appellate review of such trial court findings by the preponderance of the evidence, the standard is different.  In State v. Odom, 928 S.W.2d 18 (Tenn. 1996), our supreme court was confronted with findings of the trial court under a preponderance of the evidence standard resulting from a motion to suppress hearing.  It concluded that "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise."  Id. at 23.  In so holding, it noted that questions of witness credibility, the weight and value of evidence, and resolution of conflicts in the evidence are entrusted to the trial court as the trier of fact.  Id.  It also stated that the winning party in the trial court was entitled on appeal to the "strongest legitimate view of the evidence at the hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence."  Id.  Given the fact that the same preponderance standard of proof applies to the trial court's findings of preliminary facts in this case, we believe that the same standard of review applies.

7

Rule 804(b)(2), Tenn. R. Evid., provides the circumstances that allow for the exception to the hearsay rule that is historically known as a dying declaration:

> Statement Under Belief of Impending Death. In a prosecution for homicide, a statement made by the victim while believing that the declarant's death was imminent and concerning the cause or circumstances of what the declarant believed to be impending death.

The rationale for admitting these statements is that the awareness of impending death is equivalent to the sanction of an oath. See Anthony v. State, 19 Tenn. 265, 278 (1838), cited in Beard v. State, 485 S.W.2d 882, 885 (Tenn. Crim. App. 1972); State v. Lunsford, 603 S.W.2d 745, 746-47 (Tenn. Crim. App. 1980). The rule retains the common law limitations to the admission of dying declarations. Tenn. R. Evid. 804(b)(2), Advisory Committee Comments.

There are four preliminary facts to be proven for the admission of a hearsay statement as a dying declaration: (1) the declarant must be dead, (2) the statement must be admitted only in a homicide prosecution in which the declarant is the victim, (3) the statement must concern the cause or circumstances of death, and (4) the declarant must have spoken or written the statement under the belief that death was imminent. Of the four, the knowledge of impending death provides the indicia of reliability and truth that justifies the admission of the statement. See Neil P. Cohen, et al., Tennessee Law of Evidence, § 804(b)(2).1, at 599 (3d ed. 1995).

Under Tennessee law, it is not necessary that the declarant state unequivocally a belief that death is imminent. Awareness of impending death has been inferred from the language and condition of the declarant,[2] the facts and circumstances

---

[2] Hawkins v. State, 220 Tenn. 383, 390, 417 S.W.2d 774, 777 (1967); Crawford v. State, 197 Tenn 411, 415, 273 S.W.2d 689, 691 (1954) (told brother he was dying); Helton v. State, 195 Tenn. 36, 49, 255 S.W.2d 694, 699 (1953) (told aunt she was dying); State v. Keels, 753 S.W.2d 140, 144 (Tenn. Crim. App. 1988) (told son he was going to leave him); State v. Lunsford, 603 S.W.2d at 747 (told emergency room personnel she was going to die); Floyd v. State, 596 S.W.2d 836, 838 (Tenn. Crim. App. 1979) (told family treatment was useless); Williams v. State, 542 S.W.2d 827, 832 (Tenn. Crim. App.

surrounding the statement,[3] and medical testimony concerning the seriousness of the victim's condition.[4] The fact that a victim does not die shortly after making the statement does not preclude its admission as a dying declaration if the requirements of the rule are satisfied.[5]

In this case, the most telling point is the large extent to which the victim's body was burned. Dr. Harlan's report reflects that sixty-five percent of the victim's body was involved. Although the photographs showing the victim ten days after the burns particularly support the finding that the victim's hospital statements to her grandmother were dying declarations, they also are probative of the severe extent of the burns suffered by the victim. In this respect, they support the trial court's conclusion that the victim was aware of her impending death at the time she talked to Detective Miller. Under these circumstances, we cannot say that the evidence of record preponderates against the trial court's findings that justify the conclusion that the statements in issue are dying declarations.

**III**

---

1976) (told brother and brother's friend, "Jimmie, you killed me, you shot me."); State v. Darrell Fritts, No. 132, Monroe County, slip op. at 4 (Tenn. Crim. App. Sept. 25, 1992), app. dismissed (Tenn. Feb. 1, 1993) (told wife he was dying).

[3] State v. Branam, 604 S.W.2d 892, 894-95 (Tenn. Crim. App. 1980) (struggling to breathe, jerking and rolling spasmodically, died within moments); Crawford v. State, 197 Tenn. at 415-16, 273 S.W.2d at 691 (intestines protruding from large wound in abdomen; died within 45 minutes); State v. Muse, 637 S.W.2d 468, 470 (Tenn. Crim. App. 1982) (intermittent breathing, glazed eyes, semi-conscious); Kilburn v. State, 509 S.W.2d 237, 238-39 (Tenn. Crim. App. 1973) (severe peritonitis, blue fingernails, weakness).

[4] Floyd v. State, 596 S.W.2d at 838 (patient instinctively aware of impending death); McDonald v. State, 542 S.W.2d 388, 389 (Tenn. Crim. App. 1976) (chance of recovery was nil); State v. Darrell Fritts, slip op. at 5 (chest filled with blood, difficult breathing); State v. Isaac Lydell Herron, Shelby County, slip op. at 5 (Tenn. Crim. App. Apr. 10, 1985) (serious doubt that victim would reach hospital alive).

[5] State v. Keels, 753 S.W.2d at 144 (17 hours); State v. Lunsford, 603 S.W.2d at 746 (39 days); Floyd v. State, 596 S.W.2d at 839 (2 days); McDonald v. State, 542 S.W.2d at 389 (43 days); Kilburn v. State, 509 S.W.2d at 239 (7 days); State v. Isaac Lydell Herron, slip op. at 5 (3 days).

The defendant contends that the trial court erred in imposing the maximum sentence of twenty-five years for a Range I, standard offender.  She states that the trial court applied enhancement factors (5), treating the victim with exceptional cruelty, and (13)(B), committing a felony while on parole.  See T.C.A. § 40-35-114.  She asserts that factor (5) does not apply and that the remaining factor does not justify the sentence imposed.

However, the record reflects that the trial court actually found the following enhancement factors listed in T.C.A. § 40-35-114 to apply: (1) the defendant has a previous history of criminal convictions and behavior, (5) the defendant treated the victim with exceptional cruelty, (6) the victim's injuries were particularly great, (8) the defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release into the community, (10) the defendant had no hesitation about committing a crime where the risk to human life was high, (13)(B) the felony occurred while the defendant was on parole, and (16) the crime was committed under circumstances under which the potential for bodily injury to a victim was great.  The trial court found no mitigating factors.

In this respect, although the state acknowledges that factors (10) and (16) should not apply, given that murder inherently includes these factors, it also claims that other enhancement factors apply.  The state argues that factor (9), use of an explosive device or deadly weapon, should apply because the defendant used gasoline and that factor (11), commission of a felony involving death when previously convicted of a felony involving bodily injury, applies because of her prior aggravated assault conviction.

Appellate review of sentencing is <u>de novo</u> on the record but with a presumption that the trial court's determinations are correct. <u>See</u> T.C.A. § 40-35-401(d). The weight to be given a sentencing factor is within the trial court's discretion. <u>See</u> T.C.A. § 40-35-210, Sentencing Commission Comments; <u>State v. Moss</u>, 727 S.W.2d 229, 235 (Tenn. 1986). However, an appellate court need not ignore the existence of other enhancement or mitigating factors shown to exist in the record. <u>State v. Pearson</u>, 858 S.W.2d 879, 885 (Tenn. 1993).

First, contrary to the defendant's claim, we believe that the circumstances warrant a finding that the victim was treated with exceptional cruelty. Dousing the victim with gasoline and setting her on fire, thereby leaving her with substantial burns that required drastic treatment and ultimately resulted in death, is a particularly gruesome method of killing. Also, although we doubt that the igniting of gasoline poured onto the victim constitutes the use of an explosive device, <u>compare</u> T.C.A. § 39-17-1301(3) (explosive weapon), we agree with the state that the defendant used the gasoline in a manner to make it a deadly weapon. <u>See</u> T.C.A. § 39-11-106(a)(5)(B). Likewise, we agree with the state that enhancement factor (11) should apply relative to her prior aggravated assault conviction, involving her shooting the victim with a shotgun.

On the other hand, although the state concedes that factors (10) and (16) should not apply, we also conclude that the fact that the offense is murder precludes application of factor (6), regarding the defendant inflicting particular great injuries upon the victim. Needless to say, murder inherently involves the greatest of injuries.

Thus, the defendant's sentence is subject to enhancement under factors (1), (5), (8), (9), (11) and (13)(B). There are no mitigating factors to consider. Under the circumstances of the offense in this case and the defendant's background and

11

history, we conclude that the maximum sentence of twenty-five years constitutes the least severe measure needed to achieve the purposes of sentencing provided in T.C.A. § 40-35-102.

The judgment of conviction is affirmed.

PER CURIAM