IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

## STATE OF TENNESSEE v. ALBERT HAMPTON

**Direct Appeal from the Criminal Court for Shelby County**
**No. 97-05919 John P. Colton, Jr., Judge**

———————————

**No. W1999-00059-CCA-R3-CD - Decided May 11, 2000**

———————————

The defendant was convicted of second degree murder. There were no eyewitnesses to the killing and the murder weapon, a shotgun, was never recovered. In this appeal, the defendant asserts that the trial court improperly admitted hearsay evidence in the form of the victim's identification of the defendant and that his sentence was excessive. We find that the victim's identification of the defendant did not constitute a dying declaration and was, therefore, inadmissible hearsay. Accordingly, we reverse the judgment of the trial court and remand for a new trial.

**Tenn. R. App. P. 3; Judgment of the Trial Court Reversed and Remanded**

WADE, P.J., delivered the opinion of the court, in which WILLIAMS and OGLE, JJ., joined.

Walker Gwinn, Assistant Public Defender (on appeal), A. C. Wharton, Jr., District Public Defender (of counsel), Gwendolyn Rooks, Assistant Public Defender (at trial), Memphis, Tennessee, for the appellant, Albert Hampton.

Paul G. Summers, Attorney General & Reporter, Patricia C. Kussmann, Assistant Attorney General, Daniel Woody, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The defendant, Albert Hampton, was convicted of second degree murder. The trial court imposed a Range I sentence of 22 years. The defendant was classified as a violent offender.

In this appeal of right, there are two issues presented for our review: (1) Whether the trial court properly admitted hearsay identification evidence by the victim under the dying declaration exception; and (2) whether the 22-year sentence was excessive due to the failure to apply mitigating factors.

Because the evidence at issue did not qualify as a dying declaration, we reverse the judgment of conviction and remand the cause for a new trial.

Sometime before noon on July 1, 1995, the victim, Tarik Cobbins, went to an

apartment complex on Second Street in Memphis, where his sister, Melanasia Cobbins, shared an apartment with her boyfriend, Edward Armstrong, and another friend, Bertha Rivers. Ms. Rivers' boyfriend, John Henry Wilson, also lived in the apartment, which had three bedrooms. Charlene Clemons, the mother of Tarik and Melanasia Cobbins, had custody of Ms. Cobbins' children and drove the victim and Ms. Cobbins' two oldest children to the apartment complex. According to Ms. Cobbins, the victim was sober when he arrived. While the two children visited with Ms. Cobbins, the victim attempted to visit his girlfriend, who was pregnant at the time. Because his girlfriend was not at her residence, the victim went to an upstairs apartment occupied by the defendant. Apparently, the two men drank for several hours. At 4:00 or 4:30 P.M., there were noises indicating that the two men were fighting. Ms. Cobbins heard the noises and went to her door, where she overheard the victim yell, "Let me out of here. Man, let me out." Ms. Cobbins then saw the victim inside the defendant's apartment. The inside door was open and the victim was visible through an exterior door with wrought iron bars, which had been padlocked. According to Ms. Cobbins, the victim was shaking the bars and asking for help.

Apparently, the victim had decided to leave, but the defendant had refused to open the padlocked, barred door. According to certain of the testimony, the victim "tore up" the defendant's apartment and stole some of its contents. Each of the two men was bleeding as a result of the altercation. The victim's "lip was busted," according to Ms. Cobbins, and "he had knots on his eye and his mouth." At some point, Ms. Cobbins saw the defendant, who had barricaded himself in the bedroom; he had blood on his face and his clothing. Ms. Cobbins called the police, but before they arrived, the victim freed himself by breaking a window and climbing onto the roof. Afterward, the victim chose not to make a complaint against the defendant and the police left. Ms. Cobbins did not see the victim again until about 9:30 P.M., when he returned to the apartment complex. About 30 minutes later, Gregory McKinley, who described everyone at the Cobbins' apartment (including himself) as "drinking" and "smoking crack," was sitting on the steps of the apartment when he heard the defendant call for the victim. McKinley knocked on Ms. Cobbins' apartment door and informed the victim that the defendant was calling him from the front door of his apartment. McKinley and others warned the victim not to go to the defendant's apartment. McKinley testified that the victim chose to ignore his advice and confront the defendant at his apartment. McKinley walked outside and, within seconds, heard a gunshot and then saw the victim fall on the steps to the upstairs unit. The victim was unable to move.

Ms. Cobbins had answered the door when McKinley knocked and was aware of his report that the defendant was looking for the victim. She heard the victim walk up the steps, and almost immediately thereafter she heard a gunshot. She recalled the sounds of the victim falling down the steps. Armstrong, her boyfriend, attempted to provide assistance to the victim, who was unable to move any part of his body besides his head. Armstrong asked the victim where he had been hit, and the victim answered, "My side." Armstrong knelt by the victim in an effort to keep him calm until the police and ambulance arrived. Neighbors called the police shortly after 11:00 P.M. The police arrived 20 or 30 minutes later and called an ambulance.

Meanwhile, the defendant, according to state witnesses, locked himself inside his apartment and refused to open the door. A 12-person police unit, which included a hostage

-2-

negotiator, secured the area around the apartment. The defendant did not respond to the negotiator's attempts to communicate. He also did not respond when the police team threw a "flashbang," which is designed to cause disorientation, into his apartment, and still would not answer when tear gas was thrown into the attic above his apartment. At about 5:00 A.M., the team was able to remove the defendant from his apartment after finally throwing tear gas directly into the living area. Police discovered the defendant had a cut on his head which required treatment. When questioned, the defendant claimed that no one else had been in his apartment that day. When asked if he knew a man by the name of Tarik Cobbins, the defendant answered, "Not unless he is one of them that lives downstairs or be around them or that gang." When confronted with the statements of Gregory McKinley, the defendant responded, "Somebody's lying on me just like they always do to get me in trouble."

When questioned by the police, the defendant denied that he had shot the victim. He claimed that on the afternoon of the shooting, "Somebody knocked me in the head, knocked me unconscious." He explained that he had paid "a guy" to take him to a market where he had purchased groceries and brandy and that he had returned to his apartment for only two or three minutes before "somebody . . . knocked me unconscious." The defendant explained that he remembered nothing until he was awakened early the next morning by tear gas. He said that his Corvel brandy and about $270.00 in cash were missing from his apartment. He denied having talked to Gregory McKinley or having seen him from his doorway shortly before the shooting.

On cross-examination, McKinley admitted that he did not make a statement to the police until May 19, 1998, almost three years after the shooting. At that time, McKinley acknowledged to police that the victim had "beat up Al pretty good, trashed his whole house, and stole a lot of his stuff." He acknowledged that "Ms. Hattie," who lived upstairs and across from the defendant, had both a shotgun and a pistol, and would "shoot up in the ceiling all the time. . . ." At the time he appeared as a witness for the state, McKinley was in jail charged with aggravated assault.

Police found two shotgun waddings and blood on the landing at the building entrance. There was also blood on the sixth step. The police were never able to find a weapon inside the defendant's apartment. They did find four live .20 gauge shotgun shells, one live .410 gauge shotgun shell, and four empty .12 gauge casings under the defendant's bed.

Officer R.G. Moore of the Memphis Police Department described the crime scene and established where the shotgun wadding was found in relation to the defendant's apartment. Lieutenant Dave Martello of homicide described the activities of the TACT Unit, which handles hostage-type situations.

At the hospital, the victim's treating physician informed Ms. Cobbins and Ms. Clemons that the victim had a 50-50 chance of survival, and that if he lived, he would be paralyzed from the neck down. The doctor stated that it was unlikely that the victim, who was 23, would live beyond the age of 30. The victim was swollen and bleeding from his mouth. His bed was soaked with blood. Due to a collapsed lung, he required assistance for breathing. The victim's condition stabilized so that at about 1:00 P.M. on July 2, Ms. Cobbins was allowed to visit him. The victim

was crying, was unable to talk, and had tubes in his throat. When Ms. Cobbins asked "if Al shot him," the victim nodded yes. Ms. Clemons was present and observed the victim nod his head affirmatively to the question. The visit, which also included the victim's mother and two others, lasted about 45 minutes. The victim's family left the hospital and returned at about 7:00 P.M. that evening. They learned that the victim had suffered heart attacks and would not live. By 9:18 P.M., he was declared dead.

In the hearing on the motion to suppress the statement made by the victim while in the hospital, Amy Griffith, the keeper of the medical records at Regional Medical Center in Memphis, testified that the victim was able to communicate with his physician by nodding his head. He was described as alert. Indications were a shotgun wound to the spine. The discharge summary provided, in part, as follows:

> The patient had six large metal foreign bodies, and he suffered right hemopneumothorax, and he was a C4-5 quadriplegic. The patient underwent esophagram and bronchoscopy, both of which were negative for injury, although it was clear that his spinal cord had been injured. He was intubated for his injury, and at the time of his presentation, was awake and alert although he had developed adult respiratory distress syndrome a short time into his hospital course. . . . [D]espite maximal therapy and efforts, his ventilatory requirements became extreme. He also developed some hemodynamic instability. [T]he patient . . . had used cocaine the night previous to the event and it was thought this contributed to myocardial irritability. In addition to his neurogenic pulmonary edema, . . . he was felt to be in spinal shock and required large doses of epinephrine to maintain his blood pressure. . . . He became progressively dependent on the ventilator raising the possibility of his cord injury involving the nerve root of the phrenic. Despite maximal hemodynamically, inotropic and ventilatory support, he succumbed to his cardiopulmonary decompensation and expired during the last of numerous resuscitation attempts.

The records included a notation of the victim's condition at approximately noon on July 2:

> Patient nods head yes when asked if in pain. Medicated with MSO4, 0.4 milligrams. SIUP as per M.D. orders. Oxygen saturation 95%. Continued to suction large amounts.

Ms. Cobbins testified that she was not allowed to see the victim until about 1:00 P.M. due to the instability of his condition. She had been at the hospital all night. Ms. Clemons had arrived at 10:00 A.M. Ms. Cobbins, Ms. Clemons, the victim's girlfriend, and another friend all witnessed the statements made by the victim. The victim nodded affirmatively when asked, "Did Al shoot you?" Ms. Cobbins testified that a nurse had said that if he pulled through, he would be

paralyzed. According to Ms. Cobbins, a physician stated in the presence of the victim that there was "a chance that he might pull through . . . but if he did pull through, he was going to be paralyzed and wouldn't live to see 30." She recalled the doctor saying the victim had a 50/50 chance. Ms. Cobbins testified that the victim was awake at the time the physician made that comment. Because other tests were necessary, medical personnel asked the visitors to leave after about 45 minutes. The tests were to determine how much damage had been done to the victim's lungs by the gunshot. When Ms. Cobbins returned to the hospital between 6:00 and 7:00 P.M., the victim "was dying."

Dr. O'Brian C. Smith, who qualified as an expert in forensic pathology, anatomical pathology, and forensic firearms, performed an autopsy. He determined that the cause of death was a shotgun wound to the back of the victim. It was his opinion that the victim had been struck by eight large buckshot fired from a range of about 10 feet. Three of the pellets passed through the victim's spinal cord. Dr. Smith testified that the .12 gauge sleeves found under the defendant's bed could have been used to enlarge the diameter of a .16 gauge shell, allowing it to be fired from a .12 gauge shotgun.

I

The trial court allowed the victim's affirmative response to his sister's question about the identity of his shooter under the dying declaration exception to the hearsay rule:

> [T]his court finds that the victim, at the time, by a preponderance of the evidence . . . that at the time the statement was given that he believed <u>that he was in danger of dying</u>. The court bases this on the fact that the victim heard from the doctor that he had a 50/50 chance of living and he also heard from the nurse that he didn't have a good chance and that he did not know whether he was going to [live]. <u>[T]he court finds that he did not know whether he was going to pull through or not</u>.

(emphasis added).

In this appeal, the defendant argues that the proof did not establish that the victim believed that his death was imminent, which is required as a condition for the admission of a dying declaration, and that his medical condition had actually stabilized at the time of the statement. The state disagrees.

The term hearsay refers to a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). A "statement" may include "nonverbal conduct of a person if it is intended by the person as an assertion." Tenn. R. Evid. 801(a).

Rule 804(b)(2), Tenn. R. Evid., provides for the admission of a dying declaration as an exception to the hearsay rule:

Statement under belief of impending death. In a prosecution for homicide, a statement made by the victim while believing that the declarant's death was imminent and concerning the cause or circumstances of what the declarant believed to be impending death.

This hearsay exception is essentially a codification of the common law, and common law decisions are, therefore, pertinent to its interpretation. The rationale for this hearsay exception is that one facing imminent death will be truthful for fear of "eternal consequences." Neil P. Cohen, et al., Tennessee Law of Evidence, § 804(b)(2.1) at 599 (3d ed. 1995). The awareness of impending death is deemed equivalent to the sanction of an oath. See Anthony v. State, 19 Tenn. 265, 278 (1838) (cited in Beard v. State, 485 S.W.2d 882, 885 (Tenn. Crim. App. 1972)); State v. Lunsford, 603 S.W.2d 745, 746-47 (Tenn. Crim. App. 1980). In Smith v. State, 28 Tenn. 9, 19 (1848) (citation omitted), our supreme court observed that when the declarant "'is at the point of death, and when every hope of this world is gone, when every motive of falsehood is silenced, and the mind is induced by the most powerful consideration to speak the truth, a situation, so solemn and awful, is considered by the law as creating an obligation equal to that which is imposed by a positive oath administered in a court of justice.'"

> In this state, a dying declaration has five elements:
>
> (1) The declarant must be dead at the time of the trial;
> (2) the statement is admissible only in the prosecution of a criminal homicide;
> (3) the declarant must be the victim of the homicide;
> (4) the statement must concern the cause or the circumstances of the death; and
> (5) the declarant must have made the statement under the belief that death was imminent.

Cohen, supra, § 804(b)(2.1) at 599. In Dickason v. State, 139 Tenn. 601, 202 S.W. 922 (1918), a gunshot wound to the abdomen resulting in hardly any chance of survival by the victim was deemed a sufficient basis for the belief of imminent death. See also State v. Keels, 753 S.W.2d 140, 143 (Tenn. Crim. App. 1988). Conversations between the declarant and a physician or a family member about the physical condition of the declarant may be important indicators of whether the defendant believed death was imminent. Likewise, statements made by the declarant about his or her state of health are important factors. See, e.g., Crittendon v. State, 157 Tenn. 403, 8 S.W.2d 371 (1928). In Lunsford, this court ruled as follows:

> The entire controversy revolves around whether the declarant had "a certain belief that rapid death was inevitable." This, the learned text writer teaches us, is the most essential element of the dying declaration exception to the hearsay rule. The requirement is one of hopelessness, and it must be met. Where the person is oblivious to the danger, or where he is merely aware of the possibility or even a

<u>probability, the requirement of hopelessness is not met</u>. . . .

603 S.W.2d at 746 (emphasis added). Another treatise emphasizes that the "primary requirement of such proof is that the victim had a certain belief that rapid death was inevitable. . . ." Raybin, <u>Tennessee Criminal Practice and Procedure</u>, § 27.305 (1985). Another authoritative source provides that the declarant must have a "fixed and solemn belief that death is inevitable and near at hand." 41 CJS <u>Homicide</u> § 274 (1991). In <u>Poteete v. State</u>, our supreme court expressed concern about the expansion of the dying declaration exception to the rule against hearsay:

> Such testimony is subject to many objections and inherent infirmities. The party is not in condition, frequently, to give calm attention to the question to which he makes his statement. It is usually made in the presence of friends whose feelings are excited against the other party against whom they are to be used, and who may easily direct the dying man's attention to the points in the case bearing most heavily on the guilt of the accused, and who will most naturally leave out of the view all that tend to a different view. The accused is not present, and has neither an opportunity to make suggestions [n]or call attention to the circumstances in his favor, nor to cross-examine to show inaccuracies of memory, or expose bias from passion or prejudice.

68 Tenn. 261, 271 (1878); <u>see generally</u> <u>Dickason v. State</u>, <u>supra</u>; <u>Still v. State</u>, 125 Tenn. 80, 140 S.W. 298 (1911).

Our scope of review is limited. The findings of facts made by the trial court in a suppression hearing will be upheld unless the evidence preponderates otherwise. <u>State v. Odom</u>, 928 S.W.2d 18, 23 (Tenn. 1996). Here, however, the trial court expressed reservations about whether the victim held a certain belief that death was inevitable:

> [V]ery frankly it's very difficult for this court in this type of situation and I'll state that on the record, without having much more proof than I have. And I know you all have gotten as much as you can before this court at this time. I've got to determine what I would do if somebody said you've got a 50/50 chance. And also if I knew I had been shot six times, and if I knew I was paralyzed and heard the doctor say that I might or might not make it. I don't know. <u>It's hard to determine whether I would think I was going to die or not</u>. I'm a very positive person. I want to live, you know. I think everybody has that in them that, you know, the nature in all of us is that we are not ready to die.

(emphasis added). The trial court admitted the evidence based upon the conclusion that the defendant "believed that he was in danger of dying." That, in our view, is insufficient to meet the

-7-

test. A dying declaration may be found only in very limited circumstances. Absent a belief by the victim that death is imminent, the underlying rationale for the exception is not present. It is the knowledge of imminent death that is "the indicia of truth that justifies this hearsay exception." Cohen, supra, § 804(b)(2.1) at 599.[1] The proof in this record does not meet that threshold.

Medical records indicate that the defendant was alert when admitted to the hospital. His condition had stabilized sufficiently after a period of 15 hours from the shooting so as to allow a visit from family and friends which lasted approximately 45 minutes. After the visit, the family left the hospital. It was not until some five hours later that they received the first indication that the victim was not going to survive his injuries. Apparently, the declarant made no other statements which would incriminate the defendant after his condition deteriorated and his fate was established. Notwithstanding the fact that the victim ultimately died on the evening that he made the statement, the evidence preponderates against the trial court's conclusion that the victim made the statement under a belief that his death was imminent.

Having concluded that the trial court erroneously admitted the evidence, the question becomes whether the error can be classified as harmless. In assessing the effect of an error, this court must determine whether, in the context of the entire record of the evidence, the error affected the verdict to an extent which would leave us unable to say that it did not influence the verdict. Tennessee Rule of Appellate Procedure 36(b) provides that a verdict "shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Tennessee Rule of Criminal Procedure 52(a) provides that a conviction may be set aside only "for errors which affirmatively appear to have affected the result of the trial on the merits."

Here, the hearsay statement by the victim was the only direct evidence of guilt. Otherwise, the state relied entirely upon some physical evidence and circumstantial evidence. No murder weapon was found. There were no eyewitnesses to the shooting and, while the defendant presented a relatively weak defense, the burden was, of course, entirely upon the state to establish guilt beyond a reasonable doubt. While the defendant was charged with first degree murder and convicted of the lesser included offense of second degree murder, this court cannot say that the erroneous admission of the victim's hearsay statement did not affect the verdict. Absent the hearsay, the state's case relied primarily upon the credibility of Gregory McKinley who, after admittedly having been a part of a gathering of people who were engaging in the use of alcohol and crack cocaine, arrived first at the murder scene and testified that the defendant was standing in his doorway overlooking the stairs. The focus of a retrial would likely be upon the credibility of McKinley. In

---

[1]Other jurisdictions have a less restrictive standard for a dying declaration. In a strikingly similar situation, the Georgia Supreme Court interpreted a statute which required a dying declaration to be made "in the article of death." It ruled that the hearsay statement of the victim, who had been rendered quadriplegic by a gunshot to the neck, was admissible even though his condition was stable (not in danger of death) but he could be expected to live only a few years. He died of a pulmonary embolism shortly after his declaration. Kitchens v. State, 256 Ga. 1, 342 S.E.2d 320 (1986).

our view, justice mandates the grant of a new trial on a charge of second degree murder and any lesser included offenses.

II

Next, the defendant complains that the trial judge erred in assessing a 22-year sentence due to the failure to apply two mitigating factors:

(1)     That the defendant acted under strong provocation; and
(2)     that the defendant was suffering from a mental or physical condition which significantly reduced his culpability.

Tenn. Code Ann. § 40-35-113(2), (8). The defendant does not complain about the application of Tenn. Code Ann. § 40-35-114(1): That the defendant has a previous history of criminal convictions or criminal behavior. The state asserts that the 22-year sentence should be upheld. It further submits that the trial court should have applied an additional enhancement factor: That the defendant possessed or employed a firearm. Tenn. Code Ann. § 40-35-114(9).

When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); see State v. Jones, 883 S.W.2d 597 (Tenn. 1994). "If the trial court applies inappropriate factors or otherwise fails to follow the 1989 Sentencing Act, the presumption of correctness falls." State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992). The Sentencing Commission Comments provide that the burden is on the defendant to show the impropriety of the sentence.

Our review requires an analysis of (1) the evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, and -210; State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987). The record in this case demonstrates that the trial court made adequate findings of fact.

In calculating the sentence for felony convictions committed before July 1, 1995, the presumptive sentence is the minimum within the range if there are no enhancement or mitigating factors. Tenn. Code Ann. § 40-35-210(c) (1990) (amended July 1, 1995, to provide that the presumptive sentence for a Class A felony is the midpoint in the range). If there are enhancement factors but no mitigating factors, the trial court may set the sentence above the minimum. Tenn. Code Ann. § 40-35-210(d). A sentence involving both enhancement and mitigating factors requires an assignment of relative weight for the enhancement factors as a means of increasing the sentence. Tenn. Code Ann. § 40-35-210(e). The sentence may then be reduced within the range by any weight

assigned to the mitigating factors present.  Id.

The defendant was convicted of second degree murder, a Class A felony.  Tenn. Code Ann. § 39-13-210.  The presumptive length of a sentence for a Class A felony is the midpoint of the statutory range.  Because the defendant was a Range I offender, he qualified for a sentence of not less than 15 nor more than 25 years.  Twenty years, of course, is the midpoint.  Tenn. Code Ann. § 40-35-112(a)(1).

With regard to the enhancement factors applied by the trial court, the defendant clearly had prior criminal convictions.  In 1971, he received a one-year sentence for assault with intent to commit voluntary manslaughter.  In 1992, he was convicted of simple assault and disorderly conduct, for which he served a sentence of 27 days.  The record indicates that the defendant had several incidents of public intoxication between 1987 and 1994.  The defendant, who was born in 1950, is single.  A high school graduate, he reported that his physical condition was poor and that he had been prescribed medication for asthma, back pain, and nervousness.  The defendant has never been married and has no children.  The defendant stated that he had worked in the apparel industry from 1980 through 1985 and was declared disabled in 1986.

The trial court did not specifically comment upon either of the possible mitigating factors argued by the defense.  In our view, there was evidence of provocation, although at least five hours had passed since the altercation between the victim and the defendant and the shooting.  If applicable, that mitigating factor warranted little weight.  There was, however, insufficient evidence of a mental or physical condition on the part of the defendant which might have reduced his culpability for the crime.  Thus, the trial court properly rejected that claim of mitigation.

Moreover, the trial court could have determined that another enhancement factor, that the defendant possessed a firearm during the commission of a crime, applied.  Tenn. Code Ann. § 40-35-114(9).  The use of a gun is neither an element of second degree murder nor inherent in the offense.  See, e.g., Shelton, 854 S.W.2d at 123.  No particular weight need be given an enhancement or mitigating factor.  Even though the trial court may have overlooked a mitigating factor, there was an additional enhancement factor which warranted an increase over the minimum sentence possible.  It is our assessment that a 22-year sentence under these circumstances would have been entirely appropriate.

Because the trial court erred by allowing hearsay evidence, however, the conviction must be reversed.  The cause is remanded for a new trial on second degree murder and any lesser included offenses.