IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
July 1, 2008 Session

## STATE OF TENNESSEE v. MARIO BATEMAN a.k.a. MARIO WOODS

**Direct Appeal from the Criminal Court for Shelby County**
**No. 05-01008     James M. Lammey, Jr., Judge**

---

**No. W2007-00571-CCA-R3-CD - Filed October 28, 2008**

---

The defendant, Mario Bateman, a.k.a. Mario Woods, was convicted of first degree murder and sentenced to life imprisonment. The defendant appeals his conviction and argues that the trial court erred by (1) admitting the victim's dying declarations in violation of his Sixth Amendment right to confrontation, (2) permitting the prosecution to inquire into a witness's prior felony convictions on direct examination, and (3) allowing a witness to read his entire statement to police on redirect examination. Following our review of the parties' briefs, the record, and the applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J.C. McLin, J., delivered the opinion of the court, in which John Everett Williams and Alan E. Glenn, JJ., joined.

Claiborne H. Ferguson (at trial and on appeal) and Christopher Mitchell (at trial), Memphis, Tennessee, for the appellant, Mario Bateman a.k.a. Mario Woods.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; William L. Gibbons, District Attorney General; and Betsy Lynn Carnesale and Douglas Gregory Gilbert, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## I. BACKGROUND

Michael Watkins testified that he knew the victim, Cornelius Muhahmed, for approximately three or four months before the victim was shot and killed by the defendant. According to Mr. Watkins, he hung out with the victim at least three or four times a week. On the day of the shooting, Mr. Watkins and the victim were sitting in Mr. Watkins' car in the driveway of an abandoned house at 907 Pope in Memphis, Tennessee. Mr. Watkins stated that he had his head down and was doing a crossword puzzle when he heard a loud bang. The victim yelled, "Oh, shit." After that, Mr. Watkins heard another voice that said, "Bitch, you thought this shit was over with," followed by

more shots. Mr. Watkins stated that the shooting occurred at around 6:00 or 7:00 p.m. and it was dark outside. He and the victim had been sitting in the car a couple of hours before the shooting. Mr. Watkins was in the driver's seat and the victim was in the passenger seat.

Mr. Watkins testified that he identified the voice he heard as belonging to the defendant. He stated that he was friendly with the defendant. When the shooting occurred, Mr. Watkins looked up and saw an arm coming through the car's sunroof with a revolver. According to Mr. Watkins, the victim stumbled out of the car after the first shot. The defendant fired additional shots at the victim. Mr. Watkins exited the car and walked around to see to the victim but the victim was gone. Mr. Watkins left the scene with a friend who pulled up in his car soon after the shooting. He stated that he was scared and just wanted to see his children. Mr. Watkins also stated that he had five felony convictions, all related to the selling of drugs or facilitating the sale of drugs, and was currently on probation for possession of a controlled substance with intent to sell. He identified a photograph of his car, and identified the house and driveway where his car was parked. Mr. Watkins stated that the defendant's street name was "Cigarette."

Mr. Watkins testified that he returned to the scene of the shooting about five to ten minutes after seeing his children. Police officers were at the scene interviewing witnesses and neighbors. Mr. Watkins left the scene in his car and returned to his house. He later drove to his girlfriend's house, where he received a phone call from Chameka Duckett who told him that the police wanted him to bring the car back. Mr. Watkins returned to the scene in his car approximately thirty minutes later. His car was processed for evidence. Mr. Watkins was taken downtown and asked to make a statement to detectives in the Homicide Department. Mr. Watkins stated that there was no blood or bullet holes in his car. Mr. Watkins told police that the voice he heard sounded like the defendant's. Mr. Watkins identified the defendant from a photographic array of possible suspects.

On cross-examination, Mr. Watkins testified that he never saw the defendant's face, but he recognized the defendant from behind as he ran down Pope Street. He further identified the clothing the defendant wore as black jeans and a sweatshirt with a hood. Mr. Watkins stated that when he saw the defendant earlier that evening, he was wearing black jeans, a black shirt and a black leather jacket. Defense counsel confronted Mr. Watkins with his statement to police in which he said that the defendant wore "[b]lack jeans and a black leather jacket. I couldn't see the shirt." Mr. Watkins acknowledged that he "just figured it was a shirt." According to Mr. Watkins, no one else could have seen what happened. He acknowledged that he was on probation at the time of the shooting. Mr. Watkins stated that the empty house where he parked his car was located next door to a house belonging to Chameka Duckett. He further stated that he did not take anything out of his car after he left the scene.

On redirect examination, Mr. Watkins reiterated that he heard three or four additional shots after the first shot was fired. Mr. Watkins also read from the statement he made and signed when questioned by police. In his statement, Mr. Watkins described the clothing worn by the defendant as "[b]lack jeans and a black leather jacket. I couldn't see the shirt." Mr. Watkins stated that this was basically the same clothing the defendant had on earlier that day when he saw him walking

down the street. Mr. Watkins stated that his trial testimony was essentially the same as the statement he made to police officers.

Chameka Duckett testified that she knew both the victim and the defendant from the neighborhood. She stated that she also knew Mr. Watkins, and had "hung out" with Mr. Watkins and the victim on the day of the shooting. She recalled seeing the two men in Mr. Watkins' car in the driveway of the abandoned house next door to her house. According to Ms. Duckett, a third man named York, whom she referred to as a neighborhood crack addict, was in the backseat of the car with the two other men. She was taking a bath when she heard gunshots outside her window. Ms. Duckett continued her bath for another twenty minutes after hearing the gunshots. When she saw the blue lights from police cars, she got out of the bathtub, put on her clothes, and went outside to see what had happened. Police officers came to her house and asked if she knew of Mr. Watkins' location. She called Mr. Watkins on his cell phone and told him that the police wanted him to return his car to the scene.

Ms. Duckett also testified that she was at a store on Pope Street approximately one month before the shooting when she saw the defendant getting up off the ground after an altercation with the victim. She stated that she went downtown to the Homicide Department and made a statement to Sergeant Woodard the day after the shooting. She identified a photograph of the defendant from a photographic array of possible suspects she was shown. Ms. Duckett also told police that York was present in Mr. Watkins' car at the time of the shooting. Ms. Duckett stated that York died before trial.

Abraham Smith testified that on December 3, 2004, he lived on Kippley Street and had just exited his car in his driveway when he heard a gunshot. He walked around to the rear of his car when he saw the victim beating on the side door of his house. He called out to the victim. The victim came over to Mr. Smith and told him he had been shot and told him to call 9-1-1. According to Mr. Smith, the victim's legs began to get weak. Mr. Smith stayed with the victim who kept repeating, "I don't want to die . . . Hurry and call the ambulance." The victim fell to the ground. Mr. Smith kept asking the victim who shot him, but the victim did not respond. Officer Warren arrived and asked the victim who shot him. Officer Warren instructed Mr. Smith to move away from the victim. Mr. Smith did not hear the victim's response to the officer's question.

On cross-examination, Mr. Smith testified that the victim hopped the fence to his backyard and jumped over a gate to get to Mr. Smith's side door. Mr. Smith stated that as he and the victim waited on the ambulance and police, the victim grew increasingly weaker and more lethargic. Mr. Smith reiterated that he did not hear the victim respond to Officer Warren's questions.

Ralph Avery testified that he was a firefighter/paramedic with the Memphis Fire Department. He recalled that he responded to a call at a house on Kippley Street at approximately 7:00 p.m. on December 3, 2004. He and his partner encountered the victim lying on the street with a pulse and eye movement. Mr. Avery observed two gunshot wounds to the victim's chest. Mr. Avery asked the victim about his injuries but got no response. Mr. Avery noted that the victim was breathing

3

agonally, taking only one to two breaths per minute. Mr. Avery indicated that this was a strong indication that the victim was close to death. The victim had a carotid pulse which indicated that he had enough blood pressure to keep blood traveling to his brain. There was some evidence that the victim had vomited prior to the paramedics' arrival. The victim was quickly moved to the ambulance. Mr. Avery took over breathing for the victim during transportation to the hospital. His heart rate dropped below forty beats per minute. The victim was in critical condition and rapidly deteriorating when the paramedics transferred his care to medical personnel at the Regional Medical Center. Mr. Avery stated that prior to transferring the victim, the victim's pupils became fixed and dilated, a sign that his brain had ceased functioning. On cross-examination, Mr. Avery testified that the presence of fixed and dilated pupils was another indication of death.

Officer Michael Warren testified that on December 3, 2004, he was a patrol officer with the central precinct when he responded to a "possible shooting with one down" on Kippley Street. He arrived at the scene and found the victim lying on the ground. Officer Warren immediately ran over to the victim and began talking to him. He asked the victim who shot him. The victim responded "Mario Woods." He asked the victim for the shooter's street name and the victim told him "Cigarette." Officer Warren stated that he knew that the defendant went by the street name Cigarette. Officer Warren did not know where the victim had been shot and did not see any blood. The victim threw up and then began losing consciousness. Officer Warren continued to try to talk to the victim who had closed his eyes and was breathing very slowly. Officer Warren remained at the scene after paramedics transported the victim.

On cross-examination, Officer Warren stated that the victim was able to tell him that the defendant lived near Tutwiler and Baltic streets. Officer Warren found the victim's identification in his back pocket. On re-direct examination, Officer Warren confirmed that he cordoned off the area as a crime scene and notified his supervisor who sent out the felony response team. He stated that his responsibility was to control the crowd until the felony response team arrived.

Officer Bonzell Bibbs testified that he was a Patrol Officer with the Memphis Police Department in December of 2004 when he responded to a call on Kippley Street. After Officer Bibbs heard the victim tell Officer Warren that an individual named "Mario Woods" shot him, he went over to Pope Street where the shooting occurred. As he searched Pope Street for signs of a crime scene, a woman came running up to him and said, "Cigarette shot him – Cigarette shot him." Officer Bibbs knew Cigarette's given name and identified him as the defendant.

On cross-examination, Officer Bibbs stated that he did not hear the victim identify the shooter as Cigarette. He only learned of Cigarette's identity after the woman on Pope Street told him. Officer Bibbs could not identify the woman who gave him the information about Cigarette.

William Woodard testified that he was a Sergeant in the Homicide Bureau with the Memphis Police Department on December 3, 2004. Further, he was assigned to investigate the shooting of the victim by the defendant. He stated that the shooting occurred between 6:00 and 7:00 p.m., and the felony response team was dispatched to cover the scene before his arrival at 10:00 p.m. Sergeant

Woodard stated that he performed a walk-through of the scene and was briefed by officers as to what had happened. Sergeant Woodard spoke with Mr. Watkins and Ms. Duckett at the scene and later took statements from them downtown. Sergeant Woodard learned that the victim had identified the defendant as both Cigarette and as Mario Woods. Sergeant Woodard asked both Mr. Watkins and Ms. Duckett to identify the defendant from photographic arrays of numbered but unnamed suspects to make sure that his investigation was focused on the correct individual. He stated that the defendant used at least three different names.

Sergeant Woodard testified that four or five days after the shooting, the defendant's attorney contacted him about having the defendant surrender to police. The defendant identified himself as Mario Tatum. Sergeant Woodard did not arrest the defendant at that time because he had not completed his investigation. Sergeant Woodard was subsequently able to eliminate two other individuals named Mario Woods as suspects based on a physical description provided by Mr. Watkins. The murder weapon was never recovered.

On cross-examination, Sergeant Woodard testified that Mr. Watkins left the scene with someone else and later returned to get his car and leave again. Mr. Watkins informed Sergeant Woodard that the defendant used a revolver to shoot the victim. Mr. Watkins car was tested, but no blood or gunshot residue was found in his car. Additionally, police were unable to recover any traceable hair or fingerprint samples from Mr. Watkins' car.

On re-direct examination, Sergeant Woodard acknowledged that the information Mr. Watkins provided was corroborated by the name the victim gave police officers before he died, and by the unknown female witness on Pope Street. According to Sergeant Woodard, Mr. Watkins told police that he recognized the defendant's voice prior to the shooting. Mr. Watkins also told police that the individual he observed running down Pope Street after the shooting matched the defendant's general description.

Dr. Kenneth Snell testified that he had specialized training in clinical and forensic pathology and was the Deputy Chief Medical Examiner in Memphis in December 2004 when he conducted an examination of the victim. Dr. Snell noted four gunshot entrance wounds but only two gunshot wound exit points. He asserted that two of the gunshot wounds likely caused the victim's death. According to Dr. Snell, the first of the two fatal bullets passed through the victim from back to front, hit one of the vertebrae, and passed through the aorta and portions of the small intestines before coming to rest in the abdominal wall. He opined that this was likely the shot that killed the victim because a bullet through the aorta was a non-survivable wound without immediate vascular surgery. Additionally, Dr. Snell stated that the second bullet entered the victim's left chest, traveled through the diaphragm, through the stomach, and into one of the muscles along the vertebral column. Because this bullet passed through the stomach, the potential existed for the release of harmful bacteria which would have been fatal without medical treatment.

Vanessa Luellen testified that on the day of the shooting, she saw the victim coming out of the neighborhood store on Pope Street with Michael Watkins. Later that day, she called the victim

back to her house just to make sure he was all right. Ms. Leullen stated she had started doing this ever since the defendant threatened the victim. She stated that she had come to know the defendant through others in the neighborhood. She knew the defendant as Mario Woods, Mario Bateman, and Cigarette. According to Ms. Luellen, the victim hit the defendant in an altercation at the neighborhood store on Pope Street. Ms. Luellen said that the defendant was angry with the victim and described their relationship as strained.

Ms. Luellen testified that she saw the defendant just before Thanksgiving. At that time, the defendant told her, "I'm going to blow your cousin's ass off. I ain't forgot." Ms. Luellen also overheard another remark by the defendant while he was hanging out in the lot next door to her house. Some neighborhood men were teasing the defendant about getting hit by the victim. The defendant responded, "I'm going to blow that motherf**ker's ass off." She stated that after he made this comment, she confronted the defendant and told him that the victim had a family who would not just sit by and let him do something to the victim. Ms. Luellen also stated that a little while later, she saw the defendant and the victim sitting outside her house, drinking and smoking marijuana together. When she asked what was going on, the defendant informed her that they had worked out their differences.

Ms. Luellen testified that after she heard that the victim had been shot, she ran to the scene of the shooting but was unable to see the victim. Later that night, she was able to view the victim's body at the hospital. She spoke with police and gave a statement about the prior altercation between the defendant and the victim. Ms. Luellen identified the defendant from a photographic array provided to her by police.

On cross-examination, she testified that she spoke with Sergeant Woodard about the case. She told him that the defendant's name was Mario Woods. She stated that the original altercation which occurred between the defendant and the victim happened sometime before Halloween.

Sherhonda Coleman testified that she knew the victim as her boyfriend and had dated him for about two-and-half months before he was shot and killed on December 3, 2004. She stated that she also knew the defendant, who was her mother's boyfriend. She had known the defendant for approximately three years. According to Ms. Coleman, a conflict arose between the defendant and the victim when Ms. Coleman brought the victim home to her mother's house. The defendant told the victim to be quiet and later told him that he was not supposed to be in the house. Ms. Coleman recalled that on a separate occasion, she went with her mother to the defendant's father's house to visit the defendant after a fight between the defendant and the victim. She saw that the defendant was bleeding and had injuries to his face. Ms. Coleman continued to see the defendant at her mother's house, and he told her at one point, "I'm going to kill that n**ger for hitting me." She stated that the victim maintained his distance after the fight, and appeared to be afraid of the defendant. Ms. Coleman said that she also feared the defendant because of fights she witnessed between him and her mother. Ms. Coleman learned of the victim's death when her mother picked her up from work on the night of the shooting. She did not speak to the defendant again until after

6

he was incarcerated. She recalled that the defendant apologized to her for what had happened and wished her luck with her new baby.

On cross-examination, Ms. Coleman testified that she saw the wound on the defendant's head after his fight with the victim. She stated that the defendant had to have stitches. She stated that she did not see the defendant and the victim together again at any time after the fight.

The defendant was convicted of first degree murder and sentenced to life imprisonment. The defendant filed a motion for new trial. The motion for new trial was heard and overruled by written order on February 26, 2007. The defendant filed a timely notice of appeal on March 5, 2007.

## II. ANALYSIS

On appeal, the defendant argues that the trial court erred by (1) admitting the victim's dying declarations in violation of his Sixth Amendment right to confrontation, (2) permitting the prosecution to inquire into witness Michael Watkins' prior felony convictions on direct examination, and (3) permitting Michael Watkins to read his entire statement to police on redirect examination.

### A. Dying Declarations

As his first issue on appeal, the defendant argues that the trial court erred by admitting the victim's identification of the defendant as the individual who shot him as a non-testimonial dying declaration, in violation of his Sixth Amendment right to confrontation.

When a defendant challenges the admissibility of an out of court statement, the admissibility of those statements have traditionally been subject to the review established by the United States Supreme Court in *Crawford v. Washington*, 541 U.S. 36 (2004). *Crawford* established a standard for the admissibility of hearsay statements based upon whether they are "testimonial" or "nontestimonial" in nature. *Id*. at 51-52. The Court concluded that testimonial hearsay is admissible only where the declarant is unavailable and where there was "a prior opportunity for cross-examination." *Id*. at 68. The Court allowed the states to individually determine their standard for the admissibility of nontestimonial hearsay. *Id*. Thereafter, Tennessee's supreme court determined that the admissibility of non-testimonial hearsay would be governed by the standard set out in *Roberts*. *See State v. Maclin*, 183 S.W.3d 335 (Tenn. 2006), *abrogated by State v. Lewis*, 235 S.W.3d 136 (Tenn. 2007). Following our supreme court's opinion in *Maclin*, the United States Supreme Court issued an opinion which further explained *Crawford*. *See Davis v. Washington*, 547 U.S. 813 (2006). The Supreme Court determined that only testimonial statements cause the declarant to be a witness within the meaning of the Confrontation Clause. *Id*. at 821. Thereafter, our supreme court determined that in light of the decision in *Davis*, when "hearsay evidence is nontestimonial and otherwise admissible under our Rules of Evidence, a separate analysis under *Roberts* is unnecessary under either the federal or state constitutions." *Lewis*, 235 S.W.3d at 145.

7

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Generally, hearsay statements are inadmissible unless they fall under one of the recognized exceptions to the hearsay rule. Tenn. R. Evid. 802. The dying declaration is one such exception to the hearsay rule. Pursuant to Tennessee Rule of Evidence 804(b)(2), a dying declaration is defined as "a statement made by the victim while believing that the declarant's death was imminent and concerning the cause or circumstances of what the declarant believed to be impending death." "The rule retains Tennessee's common law limitations. The trial must be for homicide of the declarant, and the declaration is limited to circumstances surrounding the declarant's death." *Id*., Advisory Comm'n Cmts. As determined by this court, the dying declaration exception to the rule against hearsay has five elements:

(1) The declarant must be dead at the time of the trial;
(2) the statement is admissible only in the prosecution of a criminal homicide;
(3) the declarant must be the victim of the homicide;
(4) the statement must concern the cause or the circumstances of the death; and
(5) the declarant must have made the statement under the belief that death was imminent.

*State v. Hampton*, 24 S.W.3d 823, 828-29 (Tenn. Crim. App. 2000). It is the final element which "provides the indicia of truth that justifies this hearsay exception." Neil P. Cohen et al., *Tennessee Law of Evidence* § 8.35[2][f] (5th ed. 2005). "[I]t is not necessary that the declarant state unequivocally a belief that death is imminent. Awareness of impending death has been inferred from the language and condition of the declarant, the facts and circumstances surrounding the statement, and medical testimony concerning the seriousness of the victim's condition." *State v. Maruja Paquita Coleman*, No. 01C01-9401-CR-00029, 1997 WL 438169, at *5 (Tenn. Crim. App. at Nashville, July 31, 1997), *perm. app. denied* (Apr. 13, 1998).

The United States Supreme Court has noted that a dying declaration is vested with a particular reliability when narrowly applied to the prosecution of homicides, even where such declarations are deemed to be testimonial in nature:

The one deviation we have found involves dying declarations. The existence of that exception as a general rule of criminal hearsay law cannot be disputed. Although many dying declarations may not be testimonial, there is authority for admitting even those that clearly are. We need not decide in this case whether the Sixth Amendment incorporates an exception for testimonial dying declarations. If this exception must be accepted on historical grounds, it is *sui generis*.

*Crawford*, 541 U.S. at 56 n. 6 (internal citations omitted). As noted by our supreme court, this exception is widely recognized and enforced in almost every other jurisdiction. "Since *Crawford*, we found no jurisdiction that has excluded a testimonial dying declaration. Several states have specifically allowed the declaration as an exception to the rule in *Crawford*." *Lewis*, 235 S.W.3d

at 148. Our Tennessee Supreme Court further noted that "[b]ecause the admissibility of the dying declaration is also deeply entrenched in the legal history of this state, it is also our view that this single hearsay exception survives the mandate of *Crawford* regardless of its testimonial nature." *Id.*

In challenging the admissibility of the statement, the defendant does not argue that the victim's statements to Officer Warren were not dying declarations. Rather, the defendant argues that the victim's statements were testimonial in nature, and therefore, the statements should not have been admitted under *Crawford*. However, as previously noted, this court's holding in *Lewis* is controlling and clearly creates an exception for dying declarations regardless of their testimonial or nontestimonial nature. *Id.* Accordingly, the defendant is without relief as to this issue.

## B. Prior Convictions

The defendant next argues that the trial court erred by allowing the state to question its own witness about his prior convictions on direct examination.

Rule 609 of the Tennessee Rules of Evidence provides that evidence of prior convictions for felonies or crimes of dishonesty may be used for the purpose of attacking the credibility of a witness. Tenn. R. Evid. 609(a). Advisory Commission Comment (1) to Rule 609 states, "[t]his rule does not preclude questions about prior convictions during direct examination." Furthermore, this court has concluded that it is permissible for counsel to ask the defendant about prior criminal convictions where the trial court has ruled that those convictions could be used to impeach. *State v. Seay*, 945 S.W.2d 755, 761 (Tenn. Crim. App. 1996); *see also* Neil P. Cohen et al., *Tennessee Law of Evidence* § 6.09[11][b] at 6-104 (5th ed. 2005). The court explained its rationale in the following manner:

> Counsel testified at the motion for new trial hearing that because the court had already approved the state's request to question the [defendant] regarding these offenses, he wanted to soften the blow. Further, counsel did not want the jury to think they were concealing the prior convictions when it was inevitable that the state would question the [defendant] about them during cross-examination. This was a valid trial tactic often used by trial attorneys that will not be second-guessed by this Court.

*Id.*; *see also State v. Milburn Greene*, No. C.C.A. 317, 1990 WL 170431, at *3 (Tenn. Crim. App. at Knoxville, Nov. 7, 1990), *perm. app. dismissed* (Tenn. Mar. 18, 1991). Indeed, as correctly pointed out by the state, Tennessee Rule of Evidence 607 permits any party, including the party calling the witness, to impeach the credibility of the witness.

Upon review of the record, we note that the prosecution made an oral motion to preclude any questioning of Mr. Watkins about his prior convictions on the first day of trial. The trial court, after a jury-out hearing, determined that pursuant to Rule 609, Mr. Watkins' prior convictions could be used by the defendant to impeach his testimony. The prosecution called Mr. Watkins on the second

9

day of trial and preemptively questioned him about his prior convictions. The prosecution attempted to mitigate or "soften the blow" that Mr. Watkins' prior convictions might have on his credibility. We conclude that the trial court did not err by permitting the prosecution to question Mr. Watkins about his prior convictions on direct examination. *See Seay*, 945 S.W.2d at 761; Tennessee Rule of Evidence 609 Adv. Comm'n Cmt. (1). Therefore, the defendant is without relief as to this issue.

## C. Watkins' Written Statement

As his final issue on appeal, the defendant argues that the trial court erred by allowing Michael Watkins to read whole portions of his statement to police on re-direct examination.

Ordinarily, extrinsic evidence of a prior consistent statement is not admissible to bolster the credibility of a witness. *See State v. Martin*, 964 S.W.2d 564, 567 (Tenn. 1998); *State v. Hodge*, 989 S.W.2d 717, 725 (Tenn. Crim. App. 1998); *State v. Braggs*, 604 S.W.2d 883, 885 (Tenn. Crim. App. 1980) (noting that prior statements of witnesses, whether consistent or inconsistent, constitute inadmissible hearsay evidence if offered for the truth of the matter asserted). However, a prior consistent statement may be admissible when a witness is impeached through the introduction of a prior inconsistent statement that suggests that the witness' testimony was either fabricated or based upon faulty recollection. *State v. Meeks*, 867 S.W.2d 361, 374 (Tenn. Crim. App. 1993). Also, a prior consistent statement may be admissible when a prior inconsistent statement is used out of context to cross-examine the witness. *See State v. Boyd*, 797 S.W.2d 589, 593-94 (Tenn. 1990). Before a prior consistent statement may be admissible, "the witness' testimony must have been assailed or attacked to the extent that the witness' testimony needs rehabilitating." *Hodge*, 989 S.W.2d at 725.

Additionally, Tennessee Rule of Evidence 106, often referred to as the "rule of completeness," states that "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." "As one commentator has said, this so-called 'rule of completeness' allows the trier of fact to 'assess related information at the same time rather than piecemeal.'" *State v. Keough*, 18 S.W.3d 175, 182 (Tenn. 2000) (quoting Neil P. Cohen et al., *Tennessee Law of Evidence* § 106.1, at 33 (3d ed. 1995)). The court has subjected application of Rule 106 to the following considerations and limitations:

> Rule 106 is circumscribed, however, by two qualifications: (1) evidence proffered pursuant to this rule must be relevant to issues in the case; and (2) the evidence must explain or qualify already-admitted proof. Some courts have addressed the second qualification by asking whether the proffered evidence accomplishes one of the following objectives: (1) explains the admitted proof; (2) places the admitted proof in context; (3) avoids misleading the trier of fact; or (4) ensures a fair and impartial understanding of the admitted proof.

*State v. William Pierre Torres,* No. E1999-00866-CCA-R3-DD, 2001 WL 245137, at *33 (Tenn. Crim. App. at Knoxville, Mar. 13, 2001) (internal citations omitted), *aff'd in part and rev'd in part by State v. Torres*, 82 S.W.3d 236 (Tenn. 2002). A trial court's decision to admit a written document under Rule 106 will only be reversed upon a showing that the trial court abused its discretion. *See State v. Christopher Shane Harrell*, No. E2005-01531-CCA-R3-CD, 2007 WL 595885, at *9 (Tenn. Crim. App. at Knoxville, Feb. 26, 2007), *perm. app. denied* (Tenn. June 25, 2007).

Upon review of the record, it appears that the trial court permitted the prosecution to ask Mr. Watkins to read from his statement to police on redirect examination after the defense questioned Mr. Watkins about factual inconsistencies between that statement and his trial testimony. The defense questioned Mr. Watkins about variances in his description of the defendant's clothing and about what he heard the defendant say before the victim was shot. The defense had Mr. Watkins read select portions of his statement in an effort to show Mr. Watkins' testimony was based upon faulty recollection or fabrication. The prosecution asked Mr. Watkins to read his complete responses to certain questions from his statement to police officers. We discern no error and therefore no abuse of discretion by the trial court in allowing Mr. Watkins to read from his statement. The statement was relevant to show the identity of the defendant, as well as to explain a possible motive for shooting the victim. The statement served to further explain and qualify excerpts used by the defense to discredit Mr. Watkins' testimony on cross-examination. *Torres,* 2001 WL 245137, at *33. "Where specific questions and answers taken out of context do not convey the true picture of the prior statement alleged to be inconsistent, it is unfair to permit reference to isolated, unexplained responses by the witness and there is no error in allowing the statements to be placed in context." *Boyd*, 797 S.W.2d at 594. Therefore, the defendant is not entitled to relief as to this issue.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court.

_____
J.C. McLIN, JUDGE

11