# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs July 26, 2016

## STATE OF TENNESSEE v. ANITA MARIE STRICKLAND

### Appeal from the Criminal Court for Monroe County
### No. 14113    Sandra Donaghy, Judge

### No. E2015-02195-CCA-R3-CD – Filed October 18, 2016

The Defendant, Anita Marie Strickland, pled guilty to second degree murder and was sentenced to twenty-one years in the Tennessee Department of Correction ("TDOC"). The sole issue presented for our review is whether the sentence imposed by the trial court was excessive. Upon review, we affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ROBERT H. MONTGOMERY, JR., J., joined.

C. Richard Hughes, District Public Defender; and Donald Leon Shahan, Jr., Assistant Public Defender, for the Defendant-Appellant, Anita Marie Strickland.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Derek K. Smith, District Attorney General Pro Tempore, for the Appellee, State of Tennessee.

## OPINION

The Defendant was originally indicted for the first degree premeditated murder of her husband, Michael Strickland. On June 5, 2014, the Defendant pled guilty to second degree murder, with sentencing left to the trial court's discretion.[1] On October 30, 2015, the Defendant was sentenced to twenty-one years' confinement in the TDOC. This timely appeal followed.

---

[1]The guilty plea hearing transcript is not included in the record on appeal. However, we conclude that the record is adequate for our review, as most of the relevant testimony in this case was presented at the sentencing hearing. See State v. Caudle, 388 S.W.3d 273, 279 (Tenn. 2012) ("[W]hen a record does not include a transcript of the hearing on a guilty plea, the Court of Criminal Appeals should determine on a case-by-case basis whether the record is sufficient for a meaningful review[.]").

On October 11, 2013, Detective Brian Turpin of the Monroe County Sherriff's Department arrived at 1810 Fairview Road after an officer reported a body lying in the driveway covered in blood. Upon arriving at the scene, Detective Turpin found the victim lying in front of the garage with a visible gunshot wound to the neck. Emergency Medical Services ("EMS") had already arrived and determined that the victim was deceased. Detective Turpin found a "trail of what appeared to be blood spatter" spanning from inside the garage to the location where the body was found. Detective Turpin believed the victim had been working on a car in the garage, which was suspended in the air by a lift, at the time he was shot. Only one bullet, lodged in the tire of the suspended car, was found at the crime scene. Detective Turpin and the investigating officers determined that the angle of the bullet indicated the gun was fired from inside the garage. The only weapon near the victim was a pocket knife, which was found closed and secured in the victim's front right pants pocket. Detective Turpin saw the Defendant and described her as "distraught," but noted that she did not make any statements regarding what had happened.

Agent Brad Nealon with the Tennessee Bureau of Investigation interviewed the Defendant three separate times over the course of his investigation. The first interview took place at the Monroe County Sherriff's Department on the day of the murder, where the Defendant denied any involvement in her husband's death. The final two interviews took place a few hours apart on December 10, 2013, at the Defendant's house. During the second interview, the Defendant again denied any involvement in her husband's death. Agent Nealon described the Defendant as "calm and quiet" during the interview. A few hours later, Agent Nealon returned to the Defendant's residence for a third interview because he had "obtain[ed] information from the Defendant's text messag[es] that indicated some knowledge of a weapon" in the form of "messages back and forth between her and her brother, Chris Smallin." The information came directly from Mr. Smallin, who told Agent Nealon about "his involvement as to providing and then receiving a gun back from the Defendant [on] the date of the crime." During the third interview, the Defendant admitted that she shot her husband. Agent Nealon testified as follows to the Defendant's statement:

> She said that on the day that Michael was shot, that he had went [sic] to the chiropractor that morning in Knoxville, came home[,] ate breakfast, went up to the garage to work on a vehicle. She went with him. Sat there with him for a while . . . I believe she said she sat in a chair.
>
> . . .
>
> [She] [c]ame back to her home . . . and then Michael came down a little after that. He wanted her to come back up to the garage where [ ]he was at.

. . .

She told him she would be up there shortly.  He went back to the garage. She worked on some laundry and then went back to the garage, but prior to going to the garage she went to her vehicle and retrieve[d] a handgun from the vehicle.  She went to the garage, and she was sort of cloudy about what had occurred next.  She used the term, I believe, it was sort of a blur to her, and that maybe she had lost some time during that episode.

She said that she remembered running down the drive from the garage, and she thought she was -- she fired while she was running.  She didn't recall how many times she fired, and advised that she was not initially aware that she had hit Michael, but probably in her heart she knew she had.  From there, she goes to her home, she believes she changed her clothes.

. . .

Continuing, after she comes to her home she believes she changed her clothes; she takes her daughter, Tiffany, to work in Tellico.

. . .

She took her daughter to work in Tellico; met her brother at the library, and gave him the handgun, and returned back home.

Eventually, she walked up to the garage.  She said she actually thought -- she was afraid that he might be mad at her for shooting.  She walked up towards the garage and finds his body.  And she makes the 911 call afterwards.

Agent Nealon testified that the Defendant never claimed to be a victim of domestic violence at any point during the investigation.  The State also offered testimony and victim impact statements from the victim's family and introduced the presentence investigation report into evidence, without objection, as well as several photographs from the crime scene.  The presentence investigation report indicated that the Defendant had no history of criminal conduct or drug use and a steady employment history.

Following the conclusion of the State's witnesses, the Defendant testified and admitted to killing her husband.  The Defendant testified that she and her nineteen-year-old daughter, who had Down syndrome, were both subjected to verbal and physical abuse by the victim for years.  She testified that the victim told her on multiple occasions that

-3-

he would "burn the house down with [her daughter] in it." She testified that the marriage had been falling apart, that both the Defendant and the victim had extramarital affairs, and that they had also discussed the possibility of divorce in 2012. The Defendant never reported any abuse to the authorities. The Defendant also confirmed Agent Nealon's testimony that after the Defendant's husband was killed, she called her brother, met him at the library, and gave him the murder weapon. She stated that "I mean, I knew I had shot at him. I didn't know if [the bullet hit him]." The Defendant testified further that, the morning of the murder, her husband had been physically abusive to her and that in the afternoon "[h]e had threatened me." The Defendant was unclear as to the specific circumstances of the shooting, but denied shooting her husband from inside the garage and instead testified that her husband was chasing her down the driveway when she shot him.

Dr. Kimberly Brown, an expert in the field of forensic psychology, evaluated the Defendant and found that she suffered from major depressive disorder and post-traumatic stress disorder. Dr. Brown testified that the Defendant had a significant history of depression and that the Defendant's post-traumatic stress disorder diagnosis was based on the abuse she had experienced from her husband. Defense counsel offered character testimony from four additional witnesses, including the Defendant's mother. The witnesses testified that the Defendant was a good mother to her special-needs daughter and that the Defendant had been a model prisoner during her time in confinement.

The trial court applied enhancement factor (5) that the Defendant treated, or allowed the victim to be treated, with exceptional cruelty during the commission of the offense; (9) that the Defendant possessed or employed a firearm during the commission of the offense; and (14) that the Defendant abused a position of private trust. See T.C.A. § 40-35-114(5), (9), (14). The trial court also applied mitigating factor (8), that the Defendant was suffering from mental conditions that significantly reduced her culpability for the offense. See id. § 40-35-113(8). Based on these factors, and considering the evidence presented at the sentencing hearing, the trial court imposed a sentence of twenty-one years.

## ANALYSIS

The Defendant contends that her sentence is excessive under the sentencing considerations set out in Tennessee Code Annotated sections 40-35-103 and 40-35-210. Specifically, she argues that the trial court erred in applying and weighing certain enhancement factors. The State responds that the trial court properly imposed a twenty-one-year sentence. We agree with the State.

We review the length and manner of service of a sentence imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). Moreover, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." Id. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." Id. "If, however, the trial court applies inappropriate mitigating and/or enhancement factors or otherwise fails to follow the Sentencing Act, the presumption of correctness fails." State v. Carter, 254 S.W.3d 335, 344-345 (Tenn. 2008).

Upon imposing a sentence, a trial court must consider the following: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in § 40-35-113 and 40-35-114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant wishes to make in the defendant's own behalf about sentencing. T.C.A. § 40-35-210(b)(1)-(7). The defendant has the burden of showing the impropriety of the sentence on appeal. Id. § 40-35-401(d), Sentencing Comm'n Cmts. In determining the proper sentence, the trial court must consider the defendant's potential for rehabilitation or treatment. Id. § 40-35-102(3)(C) and 40-35-103(5). In addition, the court must impose a sentence "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Id. § 40-35-103(2), (4).

In this case, there is no dispute that the Defendant was subject to a sentencing range of fifteen to twenty-five years as a Range I offender, which was required to be served at 100%. See T.C.A. § 40-35-112(a)(1), -501(i)(2)(B). In determining the appropriate length of the sentence, the trial court applied three enhancing factors and one mitigating factor. On appeal, the Defendant does not challenge the trial court's application of enhancement factor (9), but asserts that factors (5) and (14) were improperly applied. See T.C.A. § 40-35-114(5), (9), (14). The Defendant also claims on appeal that mitigating factor (2), that she acted under strong provocation, should have been applied. See T.C.A. § 40-35-113(2). Upon our review, we agree with the Defendant and conclude that the record does not support the application of enhancement factors (5) and (14).

As an initial matter, the Defendant contends, and the State agrees, that the trial court erred in its application of enhancement factor (14), that the Defendant abused a position of private trust, because, due to the terrible condition of the marriage between the Defendant and the victim, "no such private trust existed at the time of the offense." We conclude that the trial court erroneously applied enhancement factor (14), as it was not supported by the record. See State v. Gutierrez, 5 S.W.3d 641, 645 (Tenn. 1999) (cautioning overbroad application of this enhancement factor based on mere existence of relationship between adults and noting that courts must look to the nature of the relationship, and whether the relationship promoted confidence, reliability, or faith).

The Defendant next contends that the trial court erred in its application of enhancement factor (5), that the Defendant treated the victim with exceptional cruelty during the commission of the offense because "[w]hile the Defendant acknowledges the suffering of the [victim] in so much as he died as a result of the injury, there is no evidence to suggest the presence of prolonged pain and suffering in addition to the actual gunshot injury." The State argues that the trial court properly found the Defendant's actions to be torturous and cruel because after the Defendant shot the victim "she did not check to see if the victim [was] still alive, nor did she seek medical help for him," and she "washed her clothing, took her daughter to work, disposed of the murder weapon . . . and only then did she return home and call 911."

The Tennessee Supreme Court has held that evidence supporting the application of the "exceptional cruelty" enhancement factor requires a finding of cruelty "over and above" what is required for the offense itself. State v. Arnett, 49 S.W.3d 250, 258 (Tenn. 2001). In other words, "'[e]xceptional cruelty,' when used as an enhancement factor, denotes the infliction of pain or suffering for its own sake or from gratification derived therefrom, and not merely pain or suffering inflicted as the means of accomplishing the crime charged." State v. Reid, 91 S.W.3d 247, 311 (Tenn. 2002). This factor is most often found in cases of abuse or torture, but it has been found applicable in cases where traumatic and severe injuries were sustained by the victim. State v. Gray, 960 S.W.2d 598, 611 (Tenn. Crim. App. 1997). When applying this factor, a trial court should articulate the actions of the defendant, apart from the elements of the offense, which constitute exceptional cruelty. State v. Goodwin, 909 S.W.2d 35, 45-46 (Tenn. Crim. App. 1995).

The trial court found that the Defendant "treated [the victim] with exceptional cruelty by leaving him there in a wounded position while she took other aspects." At the sentencing hearing; however, no medical evidence, autopsy report, or other expert proof was offered regarding the victim's precise cause or time of death. Detective Turpin testified that when he arrived at the crime scene, the victim had a visible gunshot wound to the neck with a visible exit wound, and that EMS had already arrived and declared that

the victim was deceased. The trial court concluded that "because I also haven't heard about the cause of death, I suspect that [the victim's] death was the result of this gunshot wound to the neck."

The Tennessee Supreme Court has upheld the application of enhancement factor (5) in a case involving a delay in medical treatment when the victim was injured and left alone "'unconscious and bleeding under such circumstances that it was unlikely that her condition would soon be discovered.'" State v. Poole, 945 S.W.2d 93, 99 (Tenn. 1997) (quoting State v. Poole, No. 02C01-9506-CC-00178, 1996 WL 39364, at *4 (Tenn. Crim. App. Jan. 31, 1996), aff'd. (Tenn. May 12, 1997)); see also State v. Scott, No. W2009-00707-CCA-R3-CD, 2011 WL 2420384, at *33 (Tenn. Crim. App. Oct. 18, 2011), perm. app. denied (Tenn. Oct. 18, 2011) (upholding application of enhancement factor (5) when "the defendant left the victim languishing for hours without seeking medical help." However, unlike the present case, there was proof adduced at trial or sentencing to determine whether the victim died instantly or whether the victim was in fact left suffering in a "wounded position" as the trial court concluded. Because the record is insufficient to support enhancement factor (5), the trial court erred by relying on it in sentencing.

Finally, the Defendant contends that the trial court wrongly denied application of mitigating factor (2), that the Defendant acted under strong provocation, because the court's rationale "was not based upon the facts in the record." The trial court found that the Defendant was provoked by operation of her abusive relationship with the victim, but that she was not acting under "strong provocation" the day of the murder because "the evidence is clear from [the Defendant's] own mouth, that on the day of the offense, there was [sic] no threats, no fights, no pushing, no choking." However, our review of the record reflects that the Defendant testified, albeit on cross-examination, that on the day of the offense the victim had both physically abused and threatened her.

Nevertheless, the trial court determined that the Defendant was not a credible witness, and we give great weight to the trial court's determinations concerning the credibility of witnesses. State v. Raines, 882 S.W.2d 376, 383 (Tenn. Crim. App. 1994) (holding that the trial court, as trier of fact at sentencing hearings, has opportunity to observe witnesses and that this court will not disturb those findings unless evidence contained in record clearly preponderates against them); see also State v. Lewter, 313 S.W.3d 745, 747-48 (Tenn. 2010) ("All questions as to the credibility of trial witnesses, the weight and value of the evidence, and issues of fact raised by the evidence are resolved by the trier of fact, not this Court, and we may not re-weigh or re-evaluate the evidence."). The trial court found that the Defendant gave evasive answers, that she appeared disingenuous at times, and that her testimony was not believable. The record

supports the trial court's determination, and the Defendant is not entitled to relief on this issue.

Despite the trial court's error in applying enhancement factors (5) and (14), the Defendant's sentence was otherwise supported by the proper application of enhancement factor (9), that the Defendant possessed or employed a firearm during the commission of the offense. See T.C.A. § 40-35-114(9); State v. Hampton, 24 S.W.3d 823, 832 (Tenn. Crim. App. 2000) (concluding that the use of a firearm is not an element of second degree murder and may be properly considered for enhancement purposes). Likewise, we conclude that mitigating factor (8), that the Defendant suffered from a mental or physical condition that significantly reduced the culpability for the offense, was appropriately supported by the record and the testimony of Dr. Brown.

As stated previously, a trial court's misapplication of certain enhancement factors does not invalidate a within-range sentence unless the court wholly departed from the Sentencing Act. State v. Bise, 380 S.W.3d 682, 706 (Tenn. 2012). Here, the trial court emphasized sentencing considerations beyond the enhancement factors, which are consistent with the purposes and principles of the Sentencing Act. The trial court thoroughly discussed the evidence received at the sentencing hearing, including its notes from each witness's testimony, and concluded that the evidence presented supported the State's theory. See T.C.A. § 40-35-210(b)(1). The trial court considered the violent and dangerous nature of second degree murder, noting that it is a "non-probatable" offense, and that the Defendant was initially charged with first degree murder. See id. § 40-35-210(b)(4). The trial court also carefully considered statistical information regarding sentencing practices for similar offenses in Tennessee. See id. § 40-35-210(b)(6). Accordingly, we conclude that the record sufficiently supports the trial court's mid-range sentence of twenty-one years.

## CONCLUSION

Based on the foregoing authority and analysis, we affirm the judgment of the trial court.

_____
CAMILLE R. McMULLEN, JUDGE