IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
October 4, 2016 Session

**STATE OF TENNESSEE v. ANTHONY THOMPSON**

**Appeal from the Criminal Court for Shelby County**
**No. 14-03467     J. Robert Carter, Jr., Judge**

_____

**No. W2016-00077-CCA-R3-CD  -  Filed March 9, 2017**

_____

The defendant, Anthony Thompson, was convicted of the first degree premeditated murder of Barris Jones and sentenced to life imprisonment. On appeal, he argues that the trial court erred in allowing testimony regarding a hearsay statement of the victim as a dying declaration, in limiting the cross-examination of a co-defendant, and in allowing autopsy and crime scene photographs into evidence. Additionally, he argues that the evidence is insufficient to sustain the verdict. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and TIMOTHY L. EASTER, JJ., joined.

John R. Holton, Memphis, Tennessee, for the appellant, Anthony Thompson.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Ray Lepone and Justin Prescott, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The defendant was convicted of the first degree premeditated murder of the victim, which occurred at the apartment complex where the victim lived with his girlfriend. Shot eleven times at close range, the victim uttered the defendant's name after Memphis police officers arrived at the scene and asked for a "name." A few hours later, the victim died at a hospital.

Officer Keith Holden testified that he had been employed for seven years by the Memphis Police Department and, on May 26, 2014, responded to a call at the Country Oaks Apartments, where people at the scene pointed him to "a male black down on his hands and knees with multiple gunshot wounds." Officer Holden ran to the victim and said, "Give me some information, give me a name," and the victim said, "Anthony Thompson." Officer Holden described the victim as "in pretty bad . . . shape. He was down on his hands and knees. He was bleeding out the mouth, just kind of fading in and out[.]"

On cross-examination, Officer Holden testified that he did not know whether the victim believed he was dying. He repeated that the victim was on his hands and knees, "bleeding very heavy," with "blood dripping out his mouth, and, . . ., multiple shots all over his body." The victim was unable to stand and "was kind of fading in and out, but he was able to give [Officer Holden] that name[.]" Officer Holden said he did not ask the victim to stand up because "[f]rom his condition, . . . he seemed to be in real bad shape." According to defense counsel, without objection by the State, the 911 call for the victim was made at 5:29 p.m., and he died at 10:41 p.m.

Marquitta Covington testified that the victim was the father of her baby, with whom she was pregnant at the time of the victim's death. They were living together in the apartment complex where he was killed. He had taken the garbage out at approximately 5:20 p.m., and Ms. Covington saw him "running back to the house, which [sic] two dudes w[ere] chasing him." When the victim fell, one of the men hit him, and then the other man hit him in the head with a gun, rendering him unconscious. She described the first man who chased the victim as "heavyset." A third man got out of the car, while the victim was unconscious, and stood "right on top of him," shooting him "like eight times." Ms. Covington then identified the defendant in the courtroom as the man who shot the victim multiple times. After shooting the victim, the three men returned to their vehicle and left. The only thing Ms. Covington overheard the three men say to the victim was, "You think this shit a game?"

Officer Christopher Slaughter of the Memphis Police Department Crime Scene Unit testified that he recovered certain items of evidence, took photographs, and made a sketch while at the crime scene. At trial, the defendant objected to Exhibit 11, consisting of a photograph of stains left by seven drops of blood on what appears to be a concrete walkway, and Exhibit 19, consisting of a photograph taken from a close distance of an article of clothing with significant bloodstains. Officer Slaughter said he recovered "approximately" nine shell casings at the scene.

-2-

Lemarcus Rhodes testified that, on May 26, 2014, he was living at the Country Oaks Apartments, where the homicide occurred. At the time of the incident, he heard arguing outside and a voice saying, "You think it's a game?" He heard gunshots and saw three men, "two skinny [and] one heavyset," who had a silver pistol. He agreed that, in his statement to police officers following the shooting, he had said, "The fat one had a silver gun. One of the skinny ones also had a gun. The third guy didn't have a gun that I could see. The fat guy did the shooting."

The State's next witness, Eric Warren, testified that he was employed by the Tennessee Bureau of Investigation ("TBI") as a special agent/forensic scientist. He said that the TBI lab received an envelope containing three bullets from the Shelby County Medical Examiner's office. In his opinion, all nine of the cartridge cases submitted to his office had been fired by the same weapon. The two bullets and bullet fragments could have been fired by the same weapon, but, because of the damage to them, he could not say conclusively that this was the case. The bullets and casings were consistent with a 9-millimeter caliber.

Officer Adam Pickering testified that he was employed by the Memphis Police Department and assigned to the Crime Scene Unit. On June 4, 2014, he examined a Chevrolet Malibu at the crime scene office, but nothing of significance was found inside the vehicle, and officers did not determine who owned it.

Dr. Marco Ross, a forensic pathologist, testified that he performed an autopsy on the victim on May 27, 2014. The victim had been struck by eleven bullets. Gunshot wound A entered his right temple, in front of his right ear, and fractured the base of his skull. Gunshot wound B penetrated a muscle running from the victim's right ear to the base of his neck, continued into the chest where it perforated the aortic arch, the main blood vessel coming out of the heart, and penetrated the left lung. Gunshot wounds C and D were to the victim's right arm. Gunshot wound E was to the outside part of the victim's right elbow. Dr. Ross said the victim died from multiple gunshot wounds, and the death was classified as a homicide. He said it would have been consistent with these wounds that the victim was in and out of consciousness.

Sergeant Kevin Lundy testified that he was employed by the Memphis Police Department and, in May 2014, had been assigned to the Homicide Bureau. After the defendant became a suspect in the shooting, and Sergeant Lundy had been unable to locate him, he sought assistance from other law enforcement agencies, which were also unsuccessful. In April 2015, he learned that the defendant had been arrested in Hinds County, Mississippi.

Detective Andrew Terrell testified that in April 2015 he was assigned to the Fugitive Division of the Shelby County Sheriff's Office and, on April 9, 2015, transported the defendant from the Hinds County, Mississippi Detention Facility to 201 Poplar Avenue in Memphis.

Testifying as a witness for the State, co-defendant Keron Cowan said that, along with the defendant and Thelron Richards, he was charged with the homicide of the victim. He said he knew the victim and the defendant from the neighborhood. On May 26, 2014, Mr. Cowan was at his grandmother's house, where a Memorial Day event was to be held, and received a telephone call from the defendant who said that the victim had just robbed him. Later, Mr. Cowan searched for the victim but was unable to locate him. At the time, Mr. Cowan was driving a 2005 silver Chevrolet Malibu with tinted windows. The defendant asked Mr. Cowan to take him to "Twin's"[1] residence at the Country Oaks Apartments. When they arrived, they saw the victim carrying out some trash. "Twin" then came running across the parking lot with a gun in his hand, as the victim threw the trash at Mr. Cowan and began running. Mr. Cowan hit the victim, who fell down, and "Twin" hit the victim in the back of the head with a pistol. The defendant pointed a pistol at Mr. Cowan and told him to move out of the way, which he did. As Mr. Cowan was walking away, he heard "lots" of gunshots behind him. He got back into his car and was waiting for the exit gate to open when the defendant jumped into his car. Mr. Cowan drove a short distance and told the defendant to get out, which he did. Until the pistol was pointed at him, Mr. Cowan did not know the defendant was armed. The next morning, Mr. Cowan called the Memphis Police Department to tell about the shooting.

Following this testimony, the State rested its case, as did the defendant.

## ANALYSIS

### I. Dying Declaration

The defendant argues that the trial court erred in admitting a hearsay statement of the victim as a dying declaration exception to the hearsay rule, saying that the victim did not have a certain belief that death was inevitable. We will review this argument.

Hearsay is a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Generally, hearsay statements are inadmissible unless they fall under one of the recognized exceptions to the hearsay rule. Id. at 802. The dying declaration is

---

[1] Apparently, "Twin" is the nickname for the second co-defendant, Thelron Richards.

one such exception to the hearsay rule. Rule 804(b)(2) of the Tennessee Rules of Evidence provides that "a statement made by a declarant while believing that the declarant's death was imminent and concerning the cause or circumstances of what the declarant believed to be impending death" is an exception to the rule against hearsay.

This court has noted that a statement must satisfy the following five elements to qualify as a dying declaration: (1) the declarant must be dead at the time of the trial; (2) the statement is admissible only in the prosecution of a criminal homicide; (3) the declarant must be the victim of the homicide; (4) the statement must concern the cause or the circumstances of the death; and (5) the declarant must have made the statement under the belief that death was imminent. State v. Lewis, 235 S.W.3d 136, 149 (Tenn. 2007); State v. Hampton, 24 S.W.3d 823, 828-29 (Tenn. Crim. App. 2000).[2] The last requirement provides the indicia of reliability and truth that justifies admission of the statement. See Neil P. Cohen et al., Tennessee Law of Evidence, § 8.36[2][e] (6th ed. 2011). "[I]t is not necessary that the declarant state unequivocally a belief that death is imminent. Awareness of impending death has been inferred from the language and condition of the declarant, the facts and circumstances surrounding the statement, and medical testimony concerning the seriousness of the victim's condition." State v. Maruja Paquita Coleman, No. 01C01-9401-CR-00029, 1997 WL 438169, at *5 (Tenn. Crim. App. July 31, 1997) (footnotes omitted), perm. app. denied (Tenn. Apr. 13, 1998).

The trial court explained why the victim's words qualified as a dying declaration:

Well, here's the situation. Obviously, we're talking about a Rule 804(b)(2), Statement under Belief of Impending Death. And I've reviewed the case law on this point, as well.

Obviously, in some cases where an individual states clearly, "I'm not going to make it, I want you to have this information," that those are classic examples of it, but there are some matters, particularly the State versus Bran[]am, which is the case . . . 604 S.W.2d 892 that I'm relying upon, and it does . . . basically, a review of Tennessee law on this subject in that case.

And while – like I said, if the individual articulates a belief in their impending doom, then it's a very easy conclusion for the judge to draw.

---

[2] Conditions two and three may no longer be required elements, by virtue of the 2009 amendments to Tennessee Rule of Evidence 804(b)(2). See Advisory Comm'n Cmts. However, regardless of the effect of this amendment, our analysis remains the same.

In the other cases, though – there are many of them, and Bran[]am was one of them – where the individual doesn't necessarily say that, but from which it's inferred from the condition that an individual is in.

And in this case, where an individual has multiple gunshot wounds and is bleeding from their mouth, and I think the officer's words were "fading in and out" and "in real bad shape" and that's all he gave, I think under these circumstances, I think any person who finds themselves, unfortunately, in those circumstances would have to feel that they were certainly at great risk for . . . something awful happening.

And that's the logic behind the exception to the hearsay rule, is that an individual faced with the possibility of passing from this life is presumed, under our law, to be less likely to fabricate a statement that they would make, presumably, with their last breath.

And so, for those reasons, I think this qualifies as a statement under these circumstances.

In his reply brief, the defendant cites two cases to support his argument that the State failed to show that the victim knew death was imminent. However, as we will explain, we do not conclude that these cases assist the defendant. In Hampton, 24 S.W.3d at 827, a relative of the victim testified that a physician treating the victim at the hospital had said in the presence of the victim, who was conscious, that he had a "50/50 chance" of surviving. There is no record that information such as this was provided to the victim in the present appeal. In State v. Lunsford, 603 S.W.2d 745, 747 (Tenn. Crim. App. 1980), at the scene, the victim said to police officers, "Don't let me die," and this court explained on appeal why this qualified as a dying declaration:

We believe that, under the circumstances, the spoken words themselves indicated a belief by [the victim] that she was dying. In addition, the circumstances would lead one to the conclusion that she believed she was dying. A gunshot wound to the neck from which massive amounts of blood had escaped was of a dangerous nature and character. She was experiencing extensive suffering and apparently sinking from the loss of blood. These are symptoms which usually precede death.

Id. at 747-48.

The specific argument of the defendant as to the introduction of this statement is that there was no evidence that the victim "had a certain belief that rapid death was

-6-

inevitable." However, as we have set out, such a belief may be inferred from the circumstances, including the condition of the victim. In this matter, Officer Holden testified that, when he arrived at the scene, the victim was on his hands and knees, "bleeding very heavy" from multiple gunshot wounds and drifting in and out of consciousness. To Officer Holden's question, "What happened? Who's responsible for this[?]" the victim responded, "Anthony Thompson." Dr. Ross testified that the victim had been struck by eleven bullets, two of which were shots to the head. A shot to his left temple fractured the base of his skull, and a shot to the right side of his head perforated the main blood vessel coming out of the victim's heart. Even though the victim lingered for approximately five hours after being shot, we cannot conclude that the trial court erred in determining that the required mental state of the victim could be inferred from these circumstances. The record supports the trial court's determination that the victim's words to Officer Holden were a dying declaration. Accordingly, this issue is without merit.

## II. Cross-Examination of Co-Defendant Keron Cowan

On appeal, the defendant points to several instances where the trial court improperly restricted the cross-examination of Mr. Cowan. After defense counsel had asked a number of questions regarding what Mr. Cowan expected from the State in exchange for his trial testimony, counsel continued with this same line of questioning:

Q. Okay. And the State and you have worked out some sort of deal; have you not?

A. We have not worked out a deal.

Q. Okay. You hadn't worked out anything specific, right?

A. That is correct. We have not worked out a deal.

Q. And with the understanding is, is that you're looking for some leniency by giving testimony here, right?

A. I just want the State to take my testimony in consideration.

Q. Okay. And what is it you're expecting out of the State of Tennessee?

A. I don't know because, right now, I'm currently charged with first degree murder.

Q. Okay. So, it's not like a regular job, where you know what you're going to get out of it on the front end, right?

A. That is correct.

Q. Okay. So, this is depending on how you perform testifying here as far as what kind of deal you get?

A. I . . . don't understand what you're saying, performing, because I'm not performing. I'm giving the testimony.

Q. Okay. But is the deal not dependent on how helpful your testimony is here?

[THE STATE]: I'm going to object to that, Your Honor.

THE COURT: That's sustained. . . . [I]f he knows that there'll be – then I'll totally let him answer, but I think he's . . . answered about three times that . . . he's hopeful, but he does not have anything.

[DEFENSE COUNSEL]: Okay.

After defense counsel had asked multiple questions regarding Mr. Cowan's expectations regarding his pending charge, the State objected. While it may have been a generic objection, as defense counsel argues, in context, it is clear that the objection was counsel's repeating different wordings of a question the witness already had answered multiple times.

Additionally, the defendant argues that as defense counsel asked "follow up question[s] to expose the inconsistencies in [Mr.] Cowan's testimony[,] the trial court *sua sponte* stopped the inquiry." We disagree that this argument accurately reflects what occurred at trial. During cross-examination, defense counsel asked Mr. Cowan, "[Y]ou didn't see anybody shoot anybody; is that correct?" Mr. Cowan replied, "That's correct." Later in the cross-examination, defense counsel asked Mr. Cowan, "You have no idea who fired a shot, correct?" and Mr. Cowan agreed, explaining: "No, sir. But I know that . . . [the defendant] was in front of him and had the gun at me, and [the defendant] had the gun, and he pointed it dead in my face, saying, 'Cous, get the f*** out the way.' His gun was up pointed at me." The trial court then commented, "I think we've established this" and instructed counsel to "go on to something else."

-8-

Subsequently, defense counsel returned to questions previously asked to Mr. Cowan:

Q.  And you're getting a deal from the State?

A.  I'm not getting a deal from the State. . . .  I'm hoping that the State takes my testimony in consideration.  Right now, I'm currently charged with first degree murder.  That's what I'm charged with.

Q.  Okay.  And you're here to tell us that . . . your role in this whole thing was just the peacemaker?

A.  My role is I had no role in this.  The only reason that I'm here is because [the defendant] asked me to drop him off at the Country Oaks Apartments, where he killed [the victim].

Q.  Say that again?

A.  I said – my exact words were this.  The only way that I got here was because [the defendant] asked me to take him to the Country Oaks Apartments, where, when he got there, in turn, he killed [the victim].

Q.  Okay.  Well, I think we've already established you don't know that, right, because you don't know who shot who?

A.  Well, once again –

THE COURT:  Okay.  We don't have to say it again.

THE WITNESS:  Yes, sir.

THE COURT:  You asked him to repeat the answer, and he repeated it.

We disagree with defense counsel's characterization of this exchange.  In fact, during his direct and cross-examination, Mr. Cowan explained in detail that he did not see who fired the shots at the victim.  Defense counsel asked Mr. Cowan, as he had done earlier, if he was the "peacemaker" during the confrontation.  Again, Mr. Cowan answered he was not.  Only as counsel's questions were bordering on being argumentative did the trial court end the particular line of questioning.

-9-

As this court has stated, "[t]he propriety, scope, manner and control of the cross-examination of witnesses, however, rests within the sound discretion of the trial court." State v. Dishman, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995) (citations omitted). Absent a clear showing that the discretion was abused, a trial court's ruling on evidentiary matters will not be disturbed. State v. Cauthern, 967 S.W.2d 726, 743 (Tenn. 1998). In this matter, the trial court simply ruled that defense counsel could not ask, over and over, virtually identical questions, hoping for a different answer. The trial court did not abuse its discretion by limiting the cross-examination by defense counsel. This assignment is without merit.

### III. Crime Scene and Autopsy Photographs

The defendant next argues that the trial court erred in allowing photographs of the crime scene and the victim's autopsy because they were gruesome and duplicative of other proof, as well as "inflammatory[,] . . . prejudicial," and "cumulative." The trial court overruled this objection, describing the photographs as:

> [O]ne has got the placard number one, and it has about five little droplets of blood, and the other is placard number nine, I believe, and it is a T-shirt, it looks like, and it's got blood on it and has one shell casing lodged in it.
>
> I'll note your objection, but I'm finding for the [r]ecord, . . . there [is] a little bit of blood showing on these, but these are hardly grotesque or anything, especially considering we've discussed the fact that somebody is dead as a result of this.
>
> These really don't show very much. If we continue to put in more and more of them that are cumulative, then . . . I'll ask you to renew your objection, but . . . I think at this point, they show -- they're very mild at least.

Questions concerning the admissibility of evidence generally rest within the sound discretion of the trial court and will not be disturbed absent a showing of an abuse of discretion. See State v. Pylant, 263 S.W.3d 854, 870 (Tenn. 2008) (citations omitted). A trial court is found to have abused its discretion when it applies "an incorrect legal standard or [reaches] a decision which is illogical or unreasonable and causes an injustice to the party complaining." State v. Ruiz, 204 S.W.3d 772, 778 (Tenn. 2006) (citing Howell v. State, 185 S.W.3d 319, 337 (Tenn. 2006)).

The admissibility of photographs generally lies within the sound discretion of the trial court and will not be overturned on appeal absent a clear showing that the trial court

abused its discretion. State v. Faulkner, 154 S.W.3d 48, 67 (Tenn. 2005); State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). "Tennessee courts follow a policy of liberality in the admission of photographs in both civil and criminal cases." State v. Morris, 24 S.W.3d 788, 810 (Tenn. 2000). In determining whether a photograph is admissible, the trial court must first determine whether it is relevant to a matter at issue in the case. See Tenn. R. Evid. 401; State v. Vann, 976 S.W.2d 93, 102 (Tenn. 1998); Banks, 564 S.W.2d at 949. The court must next consider whether the probative value of the photograph is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403.

As for photographs of the victim, the defendant objects to what he describes as a series of autopsy photographs. These photographs do not show the victim's blood, for, apparently, his wounds had been cleaned before they were taken. Each of the photographs is a close-up of specific gunshot wounds on the victim's body. For instance, Exhibits 28 and 29 are close-ups of the gunshot wounds to his head. Exhibit 47 is a photograph of the back of his head, with a patch of hair shaved off to show the wound, where he was struck initially by a pistol. Three of the photographs are x-rays of portions of the victim's body, showing slugs still inside him, and three others of close-ups of the slugs after they had been removed from the victim's body.

On appeal, the defendant relies upon State v. Curtis Scott Harper, No. E2014-01077-CCA-R3-CD, 2015 WL 6736747, at *14 (Tenn. Crim. App. Nov. 3, 2015), to argue that because the State presented lengthy descriptions of the victim's multiple injuries, which the defendant did not contest, the prejudicial value of the autopsy photographs outweighed their probative value. For several reasons, we disagree with this argument. First, Curtis Scott Harper concerned a particularly horrific automobile accident, and the photographs in question were described by this court as "gruesome." Id. By contrast, the objected-to photographs in the present appeal were reviewed and described by the trial court as "hardly grotesque" and showing only "a little bit of blood." We have reviewed the photographs and determined that this description is accurate. As for the probative value of the photographs, showing the victim's wounds after they had been cleaned, we conclude that the value was considerable. The first issue raised by the defendant on appeal is the claim that the record does not show that the victim was aware of his impending death, and, thus, his identification of his killer was not a dying declaration. However, the photographs of the victim's multiple devastating wounds belie this argument. Accordingly, we conclude that the trial court did not abuse its discretion in allowing the photographs into evidence. This issue is without merit.

## V. Sufficiency of the Evidence

The defendant argues on appeal that he was convicted by the uncorroborated testimony of co-defendant Keron Cowan and that, as a result, the evidence is insufficient to sustain his conviction. However, as we will set out, the State presented considerably more proof against the defendant than just the testimony of a co-defendant.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

At trial, the State's proof showed that the defendant stood over the victim, who was unconscious from a blow to the head, and shot him eleven times. Marquitta Covington identified the defendant as the one who shot the victim numerous times. Co-defendant Keron Cowan testified that he was one of the three men at the scene, that he

was the first to strike the victim, who was then hit with a pistol in the back of the head by "Twin," and that he was ordered at gunpoint by the defendant to move out of the way. As he did so, he heard numerous gunshots. Further, the victim, in a dying declaration, uttered the defendant's name in response to Officer Holden's question, "What happened? Who's responsible for this[?]" The testimony of Mr. Cowan was corroborated by that of Ms. Covington and Mr. Rhodes who said he saw the victim being attacked by three men, whom he could not identify, two of whom had pistols. Any inconsistencies or gaps in the State's proof were resolved by the jury in favor of the State. From this proof, a reasonable jury could conclude that the defendant committed the first degree premeditated murder of the victim. Accordingly, we conclude that this assignment is without merit.

## CONCLUSION

Based upon the foregoing authorities and reasoning, the judgment of the trial court is affirmed.

_____
ALAN E. GLENN, JUDGE