IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
March 25, 2026 Session

## STATE OF TENNESSEE v. MICHAEL ANTHONY HUERTA

**Appeal from the Circuit Court for Blount County**
**No. C-28486  Tammy M. Harrington, Judge**

_____

**No. E2025-00063-CCA-R3-CD**

_____

Defendant, Michael Anthony Huerta, was indicted for three counts of first degree murder and pleaded guilty to one count of second degree murder. Defendant agreed to be sentenced as a Range II offender with the length of the sentence to be determined at a sentencing hearing. Following a sentencing hearing, the trial court sentenced Defendant to serve thirty-eight years at 100 percent release eligibility. On appeal, Defendant challenges his sentence as excessive and argues that his guilty plea was involuntary and unknowing. Because Defendant's notice of appeal was untimely filed, we dismiss the appeal.

**Tenn. R. App. P. 3 Appeal as of Right; Appeal Dismissed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which J. ROSS DYER and TOM GREENHOLTZ, JJ., joined.

Rick A. Owens (on appeal), Maryville, Tennessee; and T. Scott Jones (at trial), Knoxville, Tennessee, for the appellant, Michael Anthony Huerta.

Jonathan Skrmetti, Attorney General and Reporter; Courtney N. Orr, Deputy Attorney General; Ryan Desmond, District Attorney General; and Tyler B. Parks, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Guilty Plea*

At the plea hearing, the State summarized the factual basis for the plea. On May 20, 2022, Kerry O'Hare called Defendant and told him that the victim, Blake Weckman, was interested in buying drugs. Defendant believed that Mr. Weckman had previously robbed his home, taking money and drugs. Defendant arranged, through Ms. O'Hare, to meet Mr. Weckman at the M Star Hotel in Blount County, Tennessee. Defendant, armed with a Glock 9mm handgun, rode in the back seat of a black Nissan Altima being driven by D'Ambre Gray. Anisa Penn rode in the front passenger seat. Defendant communicated with Ms. O'Hare and instructed her to direct Mr. Weckman to meet Defendant in the parking lot of the hotel. Mr. Weckman approached the vehicle, and when he walked around to the passenger side, Defendant got out of the vehicle and shot Mr. Weckman in the chest. Defendant then fled on foot. Mr. Weckman died as a result of his injuries. When police interviewed Defendant, he admitted that he believed Mr. Weckman had previously robbed him and that he went to confront Mr. Weckman on May 20. Defendant admitted to shooting Mr. Weckman and throwing the gun on the ground while he was fleeing. A Glock 9mm handgun was recovered in the area where Defendant stated he threw it, and ballistic testing confirmed that it was used to kill Mr. Weckman.

At the outset of the hearing, the State announced that Defendant would plead guilty to the lesser-included offense of second degree murder and be sentenced as a Range II offender at a later sentencing hearing. The court responded, "So his range for punishment will be between 25 to 40; is that correct?" Defendant's counsel ("plea counsel") answered, "That is correct, Your Honor." The court announced, "And release eligibility for second degree is a hundred percent, . . . ." Plea counsel answered, "That is correct." The court asked Defendant if that was his understanding of the agreement, and comments were made off the record. The court then clarified, "So it states it's a hundred percent release eligibility. In reality, you can earn up to fifteen percent sentence credit. Is that your question?" Plea counsel stated that was the agreement he explained to Defendant. The court explained that a fifteen-percent reduction was "at their discretion," and Defendant stated that he understood.

Upon questioning by the trial court, Defendant affirmed that plea counsel explained the plea agreement to him and stated that he did not have any questions about it. Defendant testified that he was twenty-three years old and that he was in his second year of college at the time of his arrest. The trial court explained that the range of punishment for second degree murder, a Class A felony, was fifteen to sixty years and that Defendant was pleading guilty as a Range II multiple offender. The court explained that Defendant's range of punishment would be "between 25 and 40 years[,]" and Defendant stated that he understood. The trial court explained Defendant's rights to him and asked Defendant if he understood those rights and wished to waive them, to which Defendant responded affirmatively.

Upon further questioning by the trial court, Defendant agreed with the facts as stated by the prosecutor and affirmed that he was entering his guilty plea freely and voluntarily. The trial court confirmed that Defendant understood he was waiving certain rights, and Defendant stated that he was satisfied with plea counsel's representation. The trial court twice asked Defendant if he had any questions about the potential sentence he might receive, and Defendant responded, "No, ma'am."

The court set the matter for a sentencing hearing and stated, "The range of punishment is between [twenty-five] to [forty] years. Do you understand that?" Defendant answered, "Yes, ma'am."

*Sentencing Hearing*

At the subsequent sentencing hearing, Ms. O'Hare testified that she met Defendant while they were students at the University of Tennessee, Knoxville. Ms. O'Hare would buy marijuana from Defendant. She met the victim, Mr. Weckman, at Defendant's residence when she was buying marijuana from Defendant. In May 2022, Defendant told Ms. O'Hare that Mr. Weckman "had robbed him of about a thousand dollars' worth of drugs like cocaine and stuff, [] that [Defendant] knew that [Mr. Weckman] was in Alcoa," and that Defendant "was looking for him." Ms. O'Hare was aware that Defendant had purchased a gun. On the night of the shooting, Mr. Weckman called Ms. O'Hare and asked if she had any marijuana he could buy. Ms. O'Hare called Defendant, and Defendant told her to "keep [Mr. Weckman] on the line" and that Defendant was going to "get his [] stuff together to go mess him up." Ms. O'Hare, who was in Virginia at the time, determined Mr. Weckman's location and told Defendant. Ms. O'Hare communicated with both men to arrange a meeting between the two. She ended her communication with Mr. Weckman after she told him that she was in the black Nissan, and he told her that he saw the vehicle. Defendant contacted Ms. O'Hare on Snapchat around 2:00 a.m. after the shooting and told her he "was really sorry" and "not to contact him, that the police had come." Ms. O'Hare learned about the shooting "a couple of weeks later."

Ms. Penn testified she was "best friends" with Defendant. She was with him "all day" on the day of the shooting. They had been drinking alcohol. When Defendant learned that Mr. Weckman was in Alcoa, Ms. Penn called Ms. Gray, her older sister, to pick them up and drive them there because Ms. Penn "was nervous." Ms. Penn knew that Defendant had been robbed and that he believed Mr. Weckman was involved. She testified that she thought they "would just go and try to beat [the victim] up or something, but [they] didn't have it set just exactly what [they] were gonna do[.]" Ms. Penn knew that Defendant had a gun. They drove to the hotel where Mr. Weckman was staying. When Mr. Weckman approached the vehicle, he first went to the driver's side and did not see Ms. O'Hare. Mr. Weckman was not carrying a gun and did not appear agitated. He walked around to the

passenger side, and Defendant "got out and pulled the gun on him." Ms. Penn said the two men "started to fight because [Mr. Weckman] grabbed [the gun]." She then heard a gunshot and saw Defendant run away. Ms. Penn and Ms. Gray "just kind of panicked" and drove away.

Ms. Gray testified that she picked up Defendant and Ms. Penn at Defendant's residence in South Knoxville and drove to the M Star Hotel in Alcoa. She testified, "The reason [they went] was because [Mr. Weckman] had robbed [Defendant] previously. [Defendant] wanted to get revenge on [Mr. Weckman] or do the same to him. That's why we were on the way there." After they parked, Mr. Weckman "eventually came outside [and] walked up to the car." He approached Ms. Gray's side of the vehicle, and she cracked the window. Mr. Weckman did not appear to be carrying any weapons, and he did not make any threats or seem agitated. He walked around the car, and Defendant got out of the vehicle and shot Mr. Weckman in the chest. Defendant then ran away, and Ms. Gray left.

Sergeant Jeff Parsons was a detective with the Alcoa Police Department at the time of the shooting. He said the shooting occurred at approximately 10:44 p.m., and he arrived at the scene at 11:07 p.m. Sergeant Parsons observed "a large amount of blood" in the parking lot, and the victim's cell phone was on the ground and still receiving text messages and phone calls. Sergeant Parsons found a shell casing and a ten- and twenty-dollar bill. He discovered that several witnesses in the balcony area of the hotel had observed the incident and saw which direction Defendant ran. He collected surveillance video footage of the incident and identified the vehicle driven by Ms. Gray. Sergeant Parsons interviewed Ms. Gray and Ms. Penn, and police and prosecutors decided to use them as cooperating witnesses against Defendant. Investigators located Ms. O'Hare through the victim's cell phone records, and she was also utilized as a cooperating witness.

In determining the length of Defendant's sentence, the trial court considered the evidence presented at the plea hearing and the sentencing hearing, the presentence report and both parties' sentencing memorandums, the principles of sentencing, the arguments of counsel, the nature and characteristics of the criminal conduct involved, any applicable mitigating and enhancement factors, and statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses.

The court found that Defendant had no history of criminal convictions, which the court weighed in Defendant's favor; however, the court found that Defendant had a history of criminal behavior, "that of engaging in the sale of illegal narcotics[,]" which the court noted were "substantial" quantities. The court found that "criminal activity is what led to this event," and the court placed "great weight" on that factor. The court discussed whether Defendant was a leader in the commission of the offense involving two or more criminal

actors. The court noted its "disgust" at the "reprehensible" actions of the other individuals involved but concluded, "at the end of the day it was [Defendant]'s decision" to procure a weapon and exact revenge on the victim; however, the court gave it little weight as an enhancement factor. The court noted that the use of a firearm was not an element of second degree murder and found that Defendant possessed or employed a firearm during the commission of the offense. The court also found that "[t]here were a lot of people around" at the time of the offense, noting that the video showed people on the hotel balcony, and concluded that the risk to human life was high.

The trial court gave mitigating weight to Defendant's youth and his lacking substantial judgment, but the court expressed its frustration that Defendant had "significant resources" at his disposal, including a supportive family, church, school, and work, yet he chose to commit murder. The court noted that it was "hard to balance." The court also gave some mitigating weight to Defendant's drug and alcohol use.

The court found that the applicable enhancement factors "far outweigh[ed]" the applicable mitigating factors and imposed a sentence of thirty-eight years' incarceration to be served at 100 percent.

Judgments of conviction were entered on December 16, 2024. On January 15, 2025, plea counsel filed a motion to withdraw from representing Defendant, stating that Defendant did not wish to proceed with counsel. On the same day, Defendant filed a pro se notice of appeal in this Court and a pro se "Motion to Reconsider" his sentence in the trial court. By order dated July 8, 2025,[1] the trial court granted plea counsel's motion to withdraw and appointed new counsel to represent Defendant. On July 18, 2025, newly appointed counsel filed an "Amended Motion to Reconsider Now Requesting to Withdraw Guilty Plea" pursuant to Tennessee Rule of Criminal Procedure 32(f).

*Motion to Withdraw Guilty Plea*

At the hearing on Defendant's motion to withdraw his guilty plea, Defendant testified that his plea counsel told him his plea agreement included a sentencing range of twenty-five to thirty years to be served at eighty-five percent. Defendant testified, "And it wasn't until I got sentenced to thirty-eight years that I realized that [] was not the deal that

---

[1] We are cognizant that orders were entered by this Court on August 6, 2025, staying Defendant's appeal, and on September 22, 2025, lifting the stay, which both stated that the trial court granted plea counsel's motion to withdraw on January 15, 2025. However, the record, which had not been transmitted at the time this Court's orders were entered, does not support this statement. This Court's April 15, 2025 Defect Notice states that the record was "still void of the ORDERS on the motion to reconsider and the motion to withdraw filed on January 15, 2025." In fact, no such orders had been entered. Rather, the record shows that an order granting counsel's motion to withdraw was not entered until July 8, 2025.

. . . I agreed to, that he had filled out [] paperwork for a different deal and had been miscommunicating that deal with me." Defendant said he only saw the last page of the plea agreement and that it had a "sticky note that said twenty-five to thirty" on it. During the plea submission hearing, Defendant heard the trial court state that he could be sentenced as a Range II offender to twenty-five to forty years. Defendant asked plea counsel about it, and plea counsel told him he was "gonna be okay." Defendant testified that he would not have pled guilty had he known his sentencing range would be twenty-five to forty years. He said he would have gone to trial instead to preserve his right to appeal.

Regarding pretrial motions, Defendant "didn't understand how motions were supposed to work." Defendant asked plea counsel "to put in motions to suppress[] due to multiple people changing their statements multiple times[.]" Defendant asked plea counsel about filing a motion to suppress, and plea counsel told him "that those all had been denied, that it's either trial or a plea deal."

On cross-examination, Defendant admitted that he shot and killed Mr. Weckman. He testified that he understood he would face a charge of first degree murder if he was allowed to withdraw his guilty plea. Defendant agreed that that the trial court went over the plea agreement, including the sentencing range, during the plea colloquy, but Defendant said he "was really just intimidated by the whole event."

Defendant's father, also named Michael Anthony Huerta, testified that he sold his house in order to hire plea counsel to represent Defendant. Mr. Huerta said Defendant was originally offered a plea deal of twenty-five to forty years, and the family "flat-out denied it right off the bat. We wouldn't even consider it." Defendant was offered a second plea deal of twenty-five to thirty years, and plea counsel advised Mr. Huerta that Defendant would "only have to do nineteen more years because of eighty-five percent good behavior and the two years[' credit for time] served." Mr. Huerta believed "this was a self-defense case" and that a sentence of twenty-five years "would be extremely high[,]" but he understood that it was Defendant's decision whether or not to accept the plea.

The trial court denied Defendant's motion to withdraw his guilty plea. The court stated that it had reviewed the transcripts of the plea hearing and sentencing hearing. The court found that it had announced the out-of-range sentencing range and release eligibility and that Defendant indicated that he understood. The court noted that Defendant had "multiple opportunities" to object or ask questions. The court stated, "At every turn -- every single turn -- it was twenty-five to forty." The court characterized Defendant's motion as "a change of heart" and concluded that Defendant entered "an informed, intelligent, knowing, voluntary plea, and it [wa]s gone over multiple different ways, including ask[ing] if [Defendant wa]s satisfied with his representation."

The trial court's written order denying Defendant's motion was entered on September 10, 2025. Through counsel, Defendant filed a notice of appeal on September 18, 2025.

*Analysis*

We begin our analysis with an examination of the procedural history and the timeliness of Defendant's appeal.[2] A notice of appeal must be filed "within 30 days after the date of entry of the judgment appealed from." Tenn. R. App. P. 4(a). The judgment in this case was entered on December 16, 2024. Defendant filed a timely pro se notice of appeal on January 15, 2025. Additionally, that same day, Defendant filed a motion to reconsider his sentence. However, Defendant was still represented by counsel at the time of the filings. Although Defendant's plea counsel filed a motion to withdraw simultaneously, no order granting the motion to withdraw was entered until July 8, 2025. Because Defendant was still represented by counsel, both of his pro se filings are legal nullities. *See State v. Swann*, No. E2025-00975-CCA-R3-CD, 2026 WL 973489, at *1 (Tenn. Crim. App. Apr. 10, 2026) ("Generally, a defendant may not proceed pro se while represented by counsel.") (citing *State v. Smith*, 492 S.W.3d 224, 242 (Tenn. 2016)), *no perm. app. filed*; *see also State v. Hester*, 324 S.W.3d 1, 33-34 (Tenn. 2010) (holding that a represented defendant cannot simultaneously exercise the right to self-representation).

Having concluded that Defendant's pro se notice of appeal failed to confer jurisdiction on this Court, we now address Defendant's Rule 32(f) motion to withdraw his guilty plea filed through appointed counsel. Rule 32(f) only permits withdrawal of a guilty plea before the judgment becomes final. The judgment in this case became final on January 15, 2025. By the time appointed counsel filed the Amended Motion to Reconsider Now Requesting to Withdraw Guilty Plea on July 18, 2025, the judgment had been final for six months. Therefore, the trial court was without jurisdiction to rule on the motion. *See State v. Lowe-Kelley*, 380 S.W.3d 30, 34 (Tenn. 2012) ("A trial court cannot rule on the merits of a late-filed motion for new trial because the judgment has become final and the trial court no longer has jurisdiction over the case.").

Finally, a valid but untimely notice of appeal was filed on September 18, 2025, nine months after the judgment was entered. As we have recognized, "[a]n untimely notice of

---

[2] Although neither party challenges the timeliness of Defendant's notice of appeal, jurisdiction is a threshold question. Tennessee Rule of Appellate Procedure 13(b) provides that "[t]he appellate court shall also consider whether the trial and appellate court have jurisdiction over the subject matter, whether or not presented for review." *See State v. Bristol*, 654 S.W.3d 917, 926 (Tenn. 2022) ("It is well settled that an appellate court must consider subject-matter jurisdiction, regardless of whether that issue was presented by the parties or addressed below.") (citation omitted).

appeal can, and often does, result in a dismissal of the appeal." *State v. Manning*, No. E2022-01715-CCA-R3-CD, 2023 WL 7439203, at *3 (Tenn. Crim. App. Nov. 9, 2023), *perm. app. denied* (Tenn. May 16, 2024). In criminal cases, however, the requirement of a timely filed notice of appeal is not jurisdictional, and it "may be waived in the interest of justice." Tenn. R. App. P. 4(a). The appealing party, though, "bears the responsibility to properly perfect his [or her] appeal or to demonstrate that the 'interests of justice' merit waiver of an untimely filed notice of appeal." *State v. Thomas*, No. W2022-00109-CCA-R3-CD, 2023 WL 328337, at *3 (Tenn. Crim. App. Jan. 20, 2023), *perm. app. denied* (Tenn. June 7, 2023); Tenn. R. App. P. 4(a).

"If this Court were to summarily grant a waiver whenever confronted with untimely notices, the thirty-day requirement of Tennessee Rule of Appellate Procedure 4(a) would be rendered a legal fiction." *State v. Rockwell*, 280 S.W.3d 212, 214 (Tenn. Crim. App. 2007). When deciding whether to waive an untimely notice of appeal, this Court has considered "the nature of the issues presented for review, the reasons for and the length of the delay in seeking relief, and any other relevant factors presented in the particular case." *Id*. Recognizing the unusual circumstances present in this case, we will examine each of these factors.

The first *Rockwell* factor, the nature of the issues raised in the appeal, invites at least a preliminary review of the merits of the issues presented. Regarding his sentencing issue, Defendant challenges the trial court's application of three enhancement factors.[3] This Court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). If a trial court misapplies an enhancing or mitigating factor in passing sentence, said error will not remove the presumption of reasonableness from its sentencing determination. *Id*. at 709. This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id*. at 709-10.

The trial court made extensive findings on the record explaining its reasons for the imposition of a within-range sentence of thirty-eight years. Moreover, Defendant concedes that the trial court properly applied as an enhancement factor that Defendant possessed or employed a firearm during the commission of the offense. *See* T.C.A. § 40-35-114(9); *State v. Hampton*, 24 S.W.3d 823, 832 (Tenn. Crim. App. 2000) (holding that application of this factor is proper because "[t]he use of a gun is neither an element of second degree murder nor inherent in the offense."). We note that application of this factor alone could

---

[3] Importantly, Defendant's argument on this issue relies on long-outdated law and ignores that the 2005 amendments to the Sentencing Act abandoned presumptive sentences and rendered enhancement factors advisory only. *See* T.C.A. §§ 40-35-114, -210(c).

- 8 -

support Defendant's sentence. *See State v. Ambrose*, No. M2023-00097-CCA-R3-CD, 2024 WL 3596231, at *10 (Tenn. Crim. App. July 31, 2024) (citing *State v. Dotson*, 450 S.W.3d 1, 103 (Tenn. 2014)) (noting that "the application of a single enhancement factor supports an enhanced sentence"), *perm. app. denied* (Tenn. Feb. 20, 2025). Furthermore, the "misapplication of an enhancement factor or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act." *Bise*, 380 S.W.3d at 706.

Turning to Defendant's second issue, the voluntariness of his guilty plea, Defendant did not seek withdrawal of his guilty plea until six months after the judgment became final. *See* Tenn. R. Crim. P. 32(f) ("After a sentence is imposed but *before the judgment becomes final*, the court may set aside the judgment of conviction and permit the defendant to withdraw the plea to correct manifest injustice." (Emphasis added)). He argues that his plea counsel misinformed him of the applicable sentencing range; however, the record belies this assertion. The transcript of the plea submission hearing reflects that the trial court engaged in the appropriate colloquy, advising Defendant throughout the proceeding of the applicable sentencing range of twenty-five to forty years. The plea agreement signed by Defendant states that Defendant would be sentenced as a Range II offender to a term of twenty-five to forty years. Despite Defendant's claim that he saw only the last page of the plea agreement, the trial court explicitly asked Defendant, "Did you go over this plea agreement with your attorney?" Defendant responded, "Yes, ma'am." The court then asked, "And did he explain this document to you?" Defendant responded, "Yes. Yes, he did, Your Honor." The court then asked, "Do you have any questions about this document?" Defendant responded, "Not at the moment, no." Each time he was questioned about his understanding of the plea agreement and potential sentence, Defendant responded that he understood and had no questions.

As to the length of the delay in filing a notice of appeal and the reasons for the delay, as we noted, the circumstances in this case are unusual. Defendant's pro se notice of appeal was timely filed but, as we determined, a legal nullity. Defendant's newly appointed counsel filed the amended motion under Rule 32(f) only ten days after having been appointed, and he filed a notice of appeal only eight days after the trial court entered its order denying the motion. Additionally, orders of this Court were entered apparently recognizing the pro se notice of appeal as valid. While these factors weigh in Defendant's favor, we ultimately conclude that the interest of justice does not require us to waive the untimely filed notice of appeal. Accordingly, we dismiss the appeal.

CONCLUSION

- 9 -

Based on the foregoing, this appeal is dismissed.

_S/Timothy L. Easter_
TIMOTHY L. EASTER, JUDGE